J. C. COREY, *et al.*, v. JAMES P. SHERMAN, Assignee, *et al.*, Appellants.

**Mutual Insurance Company—What is.** The articles of incorporation recite that an association is formed "for the mutual insurance of our property and that of all other persons who may become members of this association by the giving of mutual pledges thereon, * * * the general nature of the business of the association shall be to insure the property of its members. * * * The fund for the payment of losses and the necessary expenses thereof shall consist exclusively of money raised by assessment on mutual pledges given by the members for their insurance, such assessments only to be made by the directors or executive committee, and said assessments may be limited by the by-laws and shall always be apportioned *pro rata* among the members insured. All persons insured in the association shall be members thereof during the period of their insurance and no longer, and the charges for said insurance and membership shall be regulated by the board of directors." It is also provided that the board shall conduct the affairs of the association; that it shall be chosen by the guarantors or shareholders from their members; that the guaranty fund shall not exceed fifty thousand dollars; that the fund may be increased by a vote of two-thirds of the holders at any regular meeting; that said fund shall be secured by the obligations of the holders thereof, to be known as a "fund" or "guaranty" in such form as the directors shall approve and shall be subject to assessment by the board, not exceeding ten per cent. in any six months for the purpose of meeting assessments and expenses when there is not sufficient money raised from assessments or pledges of members to pay losses due; that all money so paid from the guaranty fund shall be deemed to be an advancement to be repaid from the funds of the association as may be ordered by the directors. The subscribers' private property is exempted from the corporate debts except as to amount of the subscription. The by-laws provide that such fund shall not be liable to assessments to pay insurance losses, "except in emergency and by majority vote of the directors." *Held,* the corporation was a mutual company under section 1160, Code, and not a stock company.

PREMIUM NOTE. The requirement of Code, 1146, that all notes taken for insurance shall so state on their face, has no application to the deposit note given by a member of a mutual company organized under Code, 1160.

INSOLVENCY. Said guaranty fund is not an asset which may be considered in arriving at whether the company is solvent.

SAME. The insolvency of a mutual company and its assignment for the benefit of creditors do not release policy holders from contributing to the payment of losses which occurred before the assignment.

**Insuring on Both Stock and Mutual Plan.** The by-laws provided for issuing mutual policies upon application and the deposit of a mutual pledge upon which a stated per cent. should be advanced in cash when the policy issued. Each applicant bound himself to pay such assessments, not exceeding one-sixth in any year, as the directors should order. A cancellation of the policy and return of the pledge was authorized whenever the assured paid whatever sums he was liable for at the time of cancellation. The company also issued policies for cash premiums. No application or other undertaking was required as to such policies. They stipulated for a cancellation and a refunding of all premiums paid, after short rates were deducted, and that assured should share in dividends accruing while the policy was running in case the company canceled, or after being in force one year. *Held*, the cash premium policies were on the stock plan and illegal and that the obligations of holders of mutual policies were not assessable to pay losses under said stock policies.

SAME. Code, 1160, under which the company was organized prohibits the payment of dividends by such companies. *Held*, the fact that the stipulation of the cash policies to pay dividends are thus illegal, does not make said policies mutual policies.

**Fraud: CANCELLATION.** The organizers of a mutual company falsely represented by advertisement that a guaranty fund was pledged to the prompt payment of all losses should other funds be inadequate and that said fund was to protect policy-holders against being assessed more than one-sixth of their obligation in one year. *Held*, these representations do not constitute such fraud as to enable those who became *members* and policy-holders after the making of said representations to have their premium notes canceled.

Kinne and Deemer, JJ., dissent, and Kinne, J., dissents from the result reached in the cause.

**Jurisdiction: EQUITY.** Our statute provides that error in adopting proceedings may be corrected and shall not work abatement; that failure to move for correction waives such error; that lack of jurisdiction appearing in the pleadings is a cause for demurrer, and if not so appearing, it is to be taken advantage of by answer, and that unless so asserted it shall be waived. (Code 2514, 2516, 2519, 2648, 2650.) *Held*, the objection that a court of equity has no jurisdiction because plaintiff has a remedy at law, cannot be first

urged on appeal. *Railway Co. v. Donnell*, 77 Iowa, 225, *disapproved.*

**Practice.** Code, 2549, provides that when a question is one of common
6a interest to many or when the parties are numerous and it is impracticable to bring them all in, one or more may sue for all. *Held*, a policy-holder of a mutual company can maintain action for all similarly interested to set aside an assignment by the company, to declare obligations made by all uncollectible, and for general relief.

Robinson, J., expresses no opinion on this point.

Granger, J., concurs in the result but declines to hold that such plaintiffs may sue for all in the absence of some authority from the others.

*Appeal from Blackhawk District Court.*—HON. D. J. LENEHAN, Judge.

MONDAY, OCTOBER 21, 1895.

Action in equity to have set aside a general assignment for the benefit of creditors, to have declared not collectible certain instruments in writing executed by the plaintiff and others, to have canceled an assessment made on those instruments, to enjoin the maintenance of actions to recover the assessment, for the appointment of a receiver, to require an assessment against certain guarantors, and for general equitable relief. There was a hearing on the merits, and a decree, from which the defendants appeal.—*Reversed.*

*Charles A. Clark, Boies, Couch & Boies*, and *Geo. W. Bunhan* for appellants.

*Alford Gates, Mullen & Pickett*, and *Henderson, Hurd, Daniels & Kissel* for appellees.

Robinson, J.—The defendants are the Citizens' Mutual Insurance Company of Waterloo, Iowa, James P. Sherman, as assignee of that company, and other persons who were concerned in its organization and business. The plaintiffs are policy holders of the

company. Measures were taken to organize the company in February, 1887. Soon after that time, it commenced to insure property owners against loss or damage by fire, lightning, cyclones, tornadoes, and windstorms, and continued in that business until the latter part of January, 1891. On the third day of February, 1891, it made a general assignment for the benefit of its creditors. The notice and articles of incorporation provided for a corporation to do a mutual insurance business, and which should have a guaranty fund of not more than fifty thousand dollars, to be secured by the obligations of persons who should subscribe to it, in such form as the directors should approve. The form of the guaranty for this fund which was adopted is as follows: "For the purpose of the guaranty or pledge fund of the Citizens' Mutual Insurance Company of Waterloo, Iowa, I hereby promise to take the number of shares of said fund set opposite my name at one hundred dollars per share, payable on the order of the directors of said association, provided that not to exceed ten per cent. thereof shall be payable in any six months and provided that the whole amount of my said subscription shall be void at my option after three years from date hereof. Dated this twenty-fourth day of February, A. D. 1887." Eighteen persons signed this obligation for shares of the fund amounting in the aggregate to the sum of fifty thousand dollars, all but one or two of whom are made parties defendant.

Two kinds of policies were issued by the company. To obtain one kind, the person who desired insurance signed an application which contained a promise to pay the company a specified sum at such time and by such installments as the directors of the company should order, pursuant to the articles of incorporation and by-laws of the company, the assessments not to exceed in any one year a

sum named; and the assessment for the first year was usually paid in advance. If the policy was desired for the term of six years, and the obligation was for the sum of sixty dollars, ten dollars would be paid in advance, and not more than ten dollars during each year of the life of the policy. For convenience, policies of that class may be termed "assessment policies." For the other, or cash, policies, the assured paid money in advance, or gave their notes payable in full without condition. More than one-half the policies issued by the company were on the cash plan. The assessments on the deposit obligations or notes were made each year in advance, and notice thereof was sent to each policy holder, subject to assessment, thirty days before his assessment matured. The receipts of the company from ordinary sources were not sufficient to pay losses and expenses, and during the year 1890 it incurred debts for money borrowed to meet its liabilities to the amount of about eleven thousand dollars. On the twenty-third day of January 1891, the subscribers to the guaranty fund met and ordered a special assessment of ten per cent. of the amount of each subscription to the guaranty fund. This was the first assessment on account of that fund which had been made. Three days later the board of directors of the company met and ordered a special assessment of twenty-five per cent. on the gross amount of each deposit note held by the company on account of policies which were in force before the first day of January, 1891, for the purpose of paying accrued losses and expenses. It was also ordered that no new policies should be issued until a further order by the board. On the third day of February, 1891, the subscribers to the guaranty fund met, and adopted a resolution rescinding the action of January 23d making a special assessment of ten per cent. of

the guaranty fund, and directing that the portion of
the assessment collected should be refunded. On the
same day the board of directors also ordered that the
portions of the assessment collected should be
refunded. At the same time, notice was received
from nearly all of the subscribers to the guaranty
fund of their withdrawal from it. The board of direc-
tors then took action as follows: "On motion, it was
resolved that general assignment of the property and
business of this company be, and the same is hereby,
made for the benefit of all the company's creditors, in
proportion to their respective claims." On the next
day the board elected James P. Sherman assignee,
and directed the president and secretary to execute all
papers necessary to carry out all orders of the board,
and papers were executed accordingly. In February,
1891, the assignee obtained from the judge of the
proper district court an order which in terms author-
ized the delivery to any policy holder of his deposit
note upon the payment by him of the twenty-five per
cent. assessment made by the board of directors on
the twenty-sixth day of January. Not quite five thou-
sand dollars were realized from that assessment, and
notes upon which the assessments were so paid were
surrendered to the makers. In May, 1891, the district
court set aside the assessment of January 26, 1891, so
far as it applied to the deposit notes upon which it
had not been paid, and ordered a new assessment
upon all deposit notes in the hands of the assignee,
and which he had not surrendered upon the payment of
an assessment of twenty-five per cent., as directed by
the order of the judge made in February. The new
assessment varied according to the time the note upon
which it was made took effect, from nine per cent. to
thirty-five and five-eighths per cent. The order pro-
vided that parties who had paid the assessment
ordered by the board, and taken up their notes, should

receive credit for the amounts they had paid. In September of the same year, the board of directors, on the suggestion of the assignee that the assessment of January 26th was not on a legal basis, and at his request, set it aside, and made a new assessment, in most if not all respects identical with that made by the district court. The money which the last assessment made by the court and by the board of directors was designed to raise was to be used in paying expenses of the company and losses, including those sustained by the holders of cash policies. It is probable that more than one-half the losses were under policies of that class. The indebtedness of the company seems to have exceeded the sum of thirty-five thousand dollars, and, to pay it, there has been collected only about five thousand dollars.

The plaintiffs, who are makers of deposit notes which were assessed by the district court in May, 1891, and by the board of directors in September of that year, claim that the organization of the company was not made according to law; that it is not a mutual insurance company; that business transacted by it was not authorized by law; that it was procured by fraud; that the assessments in question are illegal; that an assessment of the subscriptions to the guaranty fund should be made and enforced, and the proceeds used to pay the losses and expenses of the company, before the deposit notes should be assessed. The plaintiffs further allege that the questions presented by their petition are of common and general interest to more than two thousand persons, policy holders in the company on the mutual plan, who have a unity of interest in the object of this litigation; that it is impracticable to bring them all before the court in this action, or for each one of them to bring separate

actions; and that this action is brought for the individual benefit of the plaintiffs, and to prevent a multiplicity of suits, for all who are similarly interested. The district court found for the plaintiffs, and ordered and adjudged that the assessment made by the court in May, 1891, and by the board of directors in September, 1891, be set aside and canceled; that the notes made by the plaintiffs, or any of them, to the company, and held by the assignee, be canceled, and held to be illegal and void; and that the defendants be restrained from collecting or attempting to collect or transfer any of such notes. This cause has been submitted to us twice. On the first submission an opinion was filed (60 N. W. Rep. 232), but a rehearing was granted, and the cause is again submitted for our determination.

I. The appellants contend that the district court did not have jurisdiction to hear and determine this cause, for the reason that the plaintiffs had a plain, speedy, and adequate remedy in the ordinary course of law. This question was not raised by the pleadings, nor presented to the district court, but the defendants insist that the objection that the court has no jurisdiction to try a cause may be presented at any time, and that the court will on its own motion, without objection by any party to the action, refuse to consider it on the merits for lack of jurisdiction to do so. That is undoubtedly true of a court which lacks jurisdiction of the subject-matter of an action, but does not apply in this state where an action triable as at law is begun in equity and there prosecuted to a final determination, without objection by either party. Section 2514 of the Code provides that "an error of the plaintiff as to the kind of proceedings adopted shall not cause the abatement or dismissal of the action, but merely a change into the proper proceedings, and a transfer of the action to the

proper docket." An error of that kind may be corrected by the plaintiff, or the defendant may have the correction made at or before the filing of his answer. Code, sections 2515, 2516. Section 2519 contains the following: "An error as to the kind of proceedings adopted in the action is waived by a failure to move for its correction at the time and in the manner prescribed in this chapter. * *" If the petition shows that the court has no jurisdiction of the person or subject-matter of the action, the defendant may demur; and, if the want of jurisdiction is not so shown, it may be set out in the answer; but if the objection is not so taken, it shall be deemed waived. Code, sections 2648, 2650. It is contrary to the policy of the statutes of this state to dismiss an action or defeat a recovery on the mere ground that the plaintiff has erred in selecting the proceedings to obtain the relief to which he is entitled. When a mistake of that kind has been made it should be corrected by an appropriate change in the proceedings, if a correction is desired. We do not hold that a failure to object to the jurisdiction of a court will confer jurisdiction, nor that a court can determine on its merits a cause where it has no jurisdiction of the subject-matter of the litigation. But district courts of this state have both law and equity jurisdiction. Courts of equity frequently grant relief which might have been obtained at law, as, in some cases where jurisdiction has been acquired for certain purposes, it will be retained after those purposes have been accomplished, to prevent vexatious and unnecessary delays, to simplify the proceedings, and to grant complete relief. It may be that the plaintiffs in this case could have successfully defended in actions founded on their deposit notes, but they allege fraudulent practices on the part of the company to procure such notes, and courts of equity have power to set aside contracts procured by fraud. The plaintiffs

allege that the assessments in question were illegal for various reasons, and courts of equity have power, in proper cases, to restrain attempts to collect illegal claims, and the instituting of vexatious and useless litigation. The plaintiffs show an interest in the affairs and property of the company, and claim that its guaranty fund shall be resorted to before the assessments in question are enforced, and ask that an assessment on account of the guaranty fund be made. It is clear that the petition of the plaintiffs showed an apparent right to relief which a court of law could have granted, and which, especially in the absence of objection, authorized the district court, as a court of equity, to hear and determine the cause. *McVey v. Manatt*, 80 Iowa, 135 (45 N. W. Rep. 548); *Gould v. Hurto*, 61 Iowa, 47 (15 N. W. Rep. 588); *O'Brien v. Putney*, 55 Iowa, 295 (7 N. W. Rep. 615); *Tugel v. Tugel*, 38 Iowa, 350; *Van Orman v. Merrill*, 27 Iowa, 480. See, also, *Niles v. Williams*, 24 Conn. 279; *Hine v. City of New Haven*, 40 Conn. 478; *Tubb v. Fort*, 58 Ala. 277; 1 Beach, Mod. Eq. Jur. section 4; 1 Daniells, Ch. Prac. p. 550, note 3; 1 Pomeroy, Eq. Jur. sections 129, 130. We are aware that in *Railway Co. v. Donnell*, 77 Iowa, 225 (42 N. W. Rep. 176), it was said that "in the absence of any pleading raising the objection based upon the want of jurisdiction by reason of the fact that there is a plain, adequate, and complete remedy at law, or in the absence of objection in any form based upon this fact, this court will of itself, *sua sponte* raise the objection." But what was thus said was not applicable to any question presented by the record in the case, and must not be regarded as authority. We do not decide that the relief to which the petition shows the plaintiffs to be entitled could have been obtained at law, but conclude that, even if it could have been thus obtained, the objections now made to

the jurisdiction of this court to determine the case on its merits cannot be sustained, for the reasons shown.

II. The appellees affirm, and the appellants deny, that this action may be maintained, not merely for the plaintiffs, but also for the benefit of other policy holders whose interests in the matters in litigation are like those of the plaintiffs. Section 2549 of the Code is as follows: "When the question is one of a common or general interest to many persons, or when the parties are very numerous and it is impracticable to bring them all before the court, one or more may sue or defend for the benefit of the whole." The majority are of the opinion and hold that the plaintiffs have brought themselves within the provisions of that section, and that this action is not only for the benefit of the persons named as plaintiffs, but also for the benefit of all policy holders unnamed, whose interests in the matters in controversy are similar to those of the plaintiffs named. The writer does not express any opinion in regard to that question, for the reason that it is his judgment that the relief granted by the district court was limited to the plaintiffs named, and they do not appeal.

III. It is important to determine the authority under which the company was organized, and its powers with respect to the business it attempted to transact. The appellees contend that it was not a mutual but a stock company; while the appellants insist that it was a mutual company, organized to transact business authorized by section 1160, under the provisions of chapter 1 of title 9 of the Code. All parties agree that it was not organized as a mutual company, as provided by sections 1122-1125, inclusive,

which are a part of chapter 4 of title 9 of the Code. Section 1160 is of the same chapter and contains the following: "Nothing in this chapter shall be so construed as to prevent any number of persons from making mutual pledges and giving valid obligations to each other for their own insurance from loss by fire, or death, or loss or damage by tornadoes, lightning, hail-storms, cyclones or wind-storms, but such associations of persons shall in no case insure any property not owned by one of their own number, except such school houses and church buildings as the said companies deem proper to insure within the territory where they do business; * * * nor shall the provisions of this chapter be applicable to such associations or companies. * * * And such companies organized under this section shall pay the same fees for annual reports as are now paid for stock companies, but such associations or companies shall receive no premiums nor make any dividends; but the word 'premiums' herein shall not be construed to mean policy and survey fees, nor the necessary expenses of such companies." This section authorizes the organization of mutual insurance companies which shall not be subject to other provisions of the chapter in which it is found. See *State v. Iowa Mut. Aid Ass'n*, 59 Iowa, 133 (12 N. W. Rep. 782). Section 1058 of the Code authorizes the incorporation of any number of people for the transaction of any lawful business, and following sections of the same chapter prescribe the method of organization and the powers and liabilities of such corporations. The articles of incorporation of the defendant company recite that the persons therein named "do hereby form an association under the laws of Iowa for the purpose of mutual insurance upon our property and that of all other persons who may become members of this association by the giving of

mutual pledges thereon"; that "the general nature of the business to be transacted by the association shall be the insurance of the property of its members against loss or damage by fire, lightning, cyclone, tornado, or windstorms"; that "the fund of the association for the payment of insurance losses, and the necessary expenses thereof, shall consist exclusively of money raised by assessment on mutual pledges given by the members for their insurance. Such assessments shall be made only by the directors or executive committee, and may be limited by the by-laws, and shall always be apportioned *pro rata* among the members insured;" that "all persons insuring in this association shall be members thereof during the period of their insurance, and no longer, and the charges for such insurance and membership shall be regulated by the board of directors of the association." The articles were duly signed and acknowledged by the incorporators, and were recorded in the office of the recorder of Black Hawk county, and in the office of the secretary of state, and a notice of incorporation was duly published. By-laws were adopted, and the requirements of chapter 1 of title 9 of the Code in regard to the organization of corporations seem to have been fully complied with.

It is claimed, however, that certain provisions of the articles of incorporation and by-laws make the corporation a stock and not a mutual company. Those provisions relate to the guaranty fund, and to the privileges and duties of the guarantors. The articles of incorporation provide that the affairs of the association shall be conducted by a board of directors, who shall be chosen by the guarantors or shareholders from among their members; that the guaranty fund shall not exceed fifty thousand dollars, and shall consist of shares of one hundred dollars each, transferable among the members upon the

books of the association, and not otherwise; that the fund may be increased by vote of two-thirds of the holders thereof at any regular meeting, and that each share shall be entitled to one vote upon all questions affecting the interests of the association; that the articles of incorporation "may be amended at any regular or called meeting of the shareholders by two-thirds vote thereof." Article 7 relates to the guaranty fund, and is as follows: "The said fund shall be secured by the obligations of the holders thereof, to be known as 'fund' or 'guaranty,' in such form as the directors shall approve, and shall be subject to assessment by the board of directors, not exceeding ten per cent. in any six months, for the purpose of meeting losses and expenses for which the association may be liable on its certificates of insurance, but only when there is not sufficient money raised from assessments or pledges of members to pay such losses when due; and all moneys so paid from the guaranty or obligation fund shall be regarded as advancement, which shall be repaid from the funds of the association as may be ordered by the directors." Article 8 exempts the private property of members and the subscribers to the guaranty fund from the corporate debts, "except to the extent of their respective obligations to the association on account of such subscriptions." Article 9 requires the directors to elect from their own number or from the guarantors a president, a vice president, secretary, treasurer, and executive committee. The by-laws are in harmony with the articles of incorporation with respect to the guarantors and the guaranty fund, and provide that the fund shall not be liable to assessment for the payment of insurance losses, "except in emergency and by a majority vote of the directors." We do not think these provisions are sufficient to establish the character of the corporation as a stock rather than a

mutual insurance company. The guaranty fund was
not designed to be any part of the working capital of
the company, but was to be drawn upon only in case
of emergency, when the money raised from assess-
ments should be insufficient to pay losses when due;
and all money obtained from the guaranty fund was
to be regarded as a mere temporary advancement or
loan, to be refunded on the order of the directors. It
was held in *Berry v. Insurance Co.*, 94 Iowa, 134 (62
N. W. Rep. 681), that it is not unlawful for a mutual
insurance company to provide a guaranty fund by
means like those adopted in this case. The company
under consideration in the *Berry Case* was organized
under chapter 4, of title 9 of the Code, but much that
was said in that case and the conclusion reached in
regard to such a fund are applicable in this case.
The articles of incorporation of the defendant com-
pany show that its object is to do a mutual insurance
business, insuring only the property of its members.
The articles contain no authority to insure the prop-
erty of any one who is not a member. Whether the
provisions which are designed to give the subscribers
to the guaranty fund absolute control of the corpo-
ration are valid we need not determine. No objection
appears to have been made prior to the commence-
ment of this action to their enforcement, and, if
invalid, the legal existence of the company and the
obligations of the plaintiffs on their deposit notes are
not thereby impaired. We conclude that the com-
pany was organized under the provisions of chapter
1 of title 9 of the Code, to insure the property of its
members on the mutual plan, as authorized by section
1160 of the Code, and that it cannot be regarded as in
any sense a stock company.

IV. It is claimed by the appellees that their
deposit notes are not collectible, because they do not

state on their face that they were taken for insurance, as required by section 1146 of the Code. If we understand the record, it shows that the notes in question recite that they were given in consideration of a policy of insurance, which is described; but, if this were not so, the notes would not be invalid on that ground, for the reason that the section specified is a part of chapter 4 of title 9 of the Code, and therefore is not applicable in this case.

V.   It is claimed by the appellants that the cash policies were not issued on the stock plan, but were a part of the mutual insurance business which the company was authorized to do. It is said, in effect, that the chief difference between the holders of the cash and assessment policies is that the former pay in advance what the latter pay as assessed, and that it would be grossly unjust to hold that the policy holders, having the benefit of time in which to make payments, cannot be compelled to contribute for the payment of the losses sustained by those paying in full for their policies when issued. As we have seen, the company was authorized by its articles of incorporation and by section 1160 of the Code to insure the property of its members only. The funds for the payment of its losses and expenses were to consist exclusively of moneys "raised by assessment on mutual pledges given by the members for their insurance," provision being made for borrowing temporarily from the guaranty fund. The by-laws provide for the acquiring of membership as follows: "Every person wishing to become a member of this association shall, previous to being insured, deposit his application, together with his mutual obligation or pledge, upon which he shall pay ——per cent., which shall be indorsed thereon at date of the policy; and, if said application and obligation be approved by

the directors or executive committee, the policy of insurance shall bear date at noon, unless otherwise directed by the applicant." It is true that one of the articles of incorporation states that "all persons insuring in this association shall be members thereof during the period of their insurance, and no longer;" but this cannot be construed to create a membership excepting as authorized by the statute and by the articles of incorporation. The company could not have transacted business on both the stock and mutual plan. We have found that it was empowered to transact the business authorized by section 1160 of the Code, and that permits insurance on the mutual plan only; but, if the business of the company were not governed by that section, it would fall within the provisions of the other sections of the same chapter, and among them is section 1159, which prohibits companies organized upon the mutual plan to take risks upon the stock plan, and also prohibits companies organized upon the stock plan to do business upon the plan of a mutual insurance company. An examination of the policies issued by the defendant company shows that the assessment policies were issued on the application of the person who desired the insurance, and that appended to each application was an obligation by which the applicant promised to pay to the company a specified sum of money at such time and in such installments, not exceeding one-sixth of the gross amount in any one year, as the directors of the company should assess and order. When the policy was issued on such an application, the insured became a member of the company by virtue of its articles of incorporation and the statute which authorized them. Provision was made in the by-laws of the company and in the policies for

the cancellation of the policies and the surrender of the obligation of the insured upon the payment of all sums for which they were liable. The assured under a cash policy was not required to sign an application nor an undertaking of any kind. The policy he received provided for its cancellation and a refund of the premium received, after deducting therefrom the short rates, and also provided that in case the policy had been in force one year, or in case of its cancellation by the company, the assured should be entitled to a proportionate share of the benefits of the company during the time his policy should have been in force, but a cancellation by him forfeited his right to dividends. Some reliance is placed upon the last provision, but it is in violation of section 1160 of the Code, which prohibits the payment of dividends by companies organized under it. A section of the by-laws provides that "the association will make insurance for a term not exceeding six years, and the amount to be deposited in cash and obligation for the insurance of any buildings or other property shall be according to the hazard of such risk and all circumstances affecting such risk." The deposit in cash referred to is that part of the obligation which was to be collected in advance. The company, in issuing assessment policies, required the payment of one assessment when the policy was issued. That practice was authorized by the section of the by-laws quoted, and was important and proper to provide funds for the current necessities of the company, and to prevent insuring property without compensation, and was not a violation of the law which required it to do a mutual business. The obligation of the assured remained subject to assessment, and the mutuality of the pledges of the holders of the assessment policies was not in

any manner affected by the payment of the first assessment.

Whether money might be deposited as a pledge under section 1160 of the Code is a question we need not determine, for the reason that neither the articles of incorporation and the by-laws of the company nor its practice warrant the claim that the cash payments were designed to be mere pledges. There was no pretense that the money so paid was to be drawn upon from time to time by means of assessments, and that the portion, if any, remaining at the end of the term of insurance, was to be refunded. The payments were absolute, without condition, excepting in the case of cancellation. We conclude that cash policies were issued on the stock plan, and therefore without authority.

VI. The fraud with which the company is charged in procuring the deposit notes in question is alleged to have been committed substantially as follows: In February, 1887, James P. Sherman published a notice to the effect that he and his associates would organize the company, and that "the guaranty fund or capital stock shall not exceed the sum of fifty thousand dollars, which shall be paid as ordered by the directors and as required in said articles and by-laws." The articles of incorporation we have already considered were adopted, and the company was organized. A notice of incorporation was published, which contained the following: "The said corporation, by its articles of incorporation and by-laws authorizes and provides for a guaranty fund, not to exceed fifty thousand dollars, consisting of limited individual pledges made by certain of the incorporators and other members, which shall be paid as ordered by the directors and as required in said articles and by-laws." The notice and articles described the business of the corporation as that of a

mutual insurance company. Circulars, folders, and other advertisements were issued by the company, which contained various representations calculated to inspire confidence in the plans and methods of the company, and stated that the guaranty fund was pledged to the prompt payment of the losses should the funds from the assessment be inadequate, thus affording double security to the policy holders. The guaranty fund was always described as a part of the assets of the company, and sometimes as permanent and as designed to protect policy holders against an assessment of more than one-sixth of the amount of their deposit notes in any one year. There were also representations to the effect that the company was a corporation of this state, composed of people who resided in it, and that it was designed to transact business only in this state. Other claims were also made, which are shown to have been well founded.

We do not think the alleged fraud on the part of the company furnishes sufficient ground upon which to relieve the plaintiffs from liability on their deposit notes. They knew that the company claimed to do business on the mutual plan, and, when they gave their obligations and received their policies, they became members of it. It is well settled that the members of a mutual insurance company are presumed to have knowledge of its articles of incorporation and by-laws. *Hobbs v. Association,* 82 Iowa, 112 (47 N. W. Rep. 983); *Walsh. v. Insurance Co.,* 30 Iowa, 144; *Simeral v. Insurance Co.,* 18 Iowa, 319. See, also, *Lucas v. Transfer Co.,* 70 Iowa, 546 (30 N. W. Rep. 771); May, Ins. section 552; 2 Wood, Ins. section 538. The articles of incorporation and by-laws showed conclusively that the guaranty fund was not designed to relieve the makers of deposit notes from the assessments to which they were liable

by their terms, and there was nothing in the represen-
tations of which they complain which could have mis-
led them to their prejudice. Many of them were mere
expressions of belief or opinion, and should have been
treated as such by the plaintiffs if they knew of them.
The notice published by James P. Sherman was not
required by law. The notice of incorporation stated
that the guaranty fund consisted of limited individual
pledges, and as to that, was of a nature to provoke
inquiry. Very few of the alleged false representa-
tions are shown to have influenced the plaintiffs or to
have been known by them. They had constructive
knowledge, at least, of the provisions contained in the
articles of incorporation and by-laws in regard to the
funds which were to be used in the payment of
expenses and losses, and they had actual knowledge
of the obligations they signed. Most of the represen-
tations in regard to the guaranty fund were in fact
true, and it had an existence in the form of the obli-
gation of the subscribers to it when the policies of the
plaintiffs were issued, and until the day of the assign-
ment. The plaintiffs had no reason to believe that the
guaranty fund would be used to relieve them perma-
nently from any part of the assessments to which
their obligations made them liable, and they have no
just ground for complaint if they are not required to
pay more money in any year, nor to pay more in the
aggregate than their contracts warrant. The pro-
vision in the subscription to the guaranty fund for
the termination of the liability of the guarantors may
not have been known to the plaintiffs, and they are
not shown to be chargeable with knowledge of it, but
that provision in no manner affects their liability on
the deposit notes in question. It may be that the rep-
resentations made by officers and agents of the
company to some of the plaintiffs, and statements con-
tained in some of the advertising matter circulated

in its interests, if relied upon by them, would have authorized a court of equity to cancel their contracts on the ground of fraud, upon a showing that the plaintiffs were in fact ignorant of the actual contents of the articles of incorporation and of the contents of the by-laws and of the condition of the guaranty fund, had timely application for that relief been made. It is evident that the security to the assured for loss he should sustain, and the value of his policy, would have been greater had there been a guaranty fund which was available at all times when the money from assessments was insufficient to pay losses, and which could not be destroyed at the option of the guarantors even after a term of years. But the plaintiffs have had the benefit of the insurance during the time for which they are sought to be held liable, and have not been prejudiced by the fraud of which they complain. It would be unjust to their associates in the company, who necessarily relied upon their obligations as well as those of the other members, for security, to deprive them of it, especially in view of the fact that the plaintiffs did not ask to be relieved from liability until the company had ceased to do business and had assigned its property for the benefit of creditors.

VII.   It is claimed that the plaintiffs have shared the benefits which inured to the company from the business which was conducted on the stock plan, and that it would be equitable to require them to aid in paying the losses sustained under cash policies. There is nothing in the record to show which class of policy holders was most benefited by the doing of business on both the stock and mutual plans. The money received from all the business transacted appears to have been used as a common fund from which to pay expenses, and also losses, without regard to the kind of policy under which they

occurred. The cash policies were issued largely on property outside of the state for short terms. Which kind of insurance produced the largest revenue, and which had the most losses, are facts not shown. It is certain that some of the plaintiffs knew the company was issuing policies for cash premiums, but they do not appear to have been responsible for that plan of doing business, and did nothing which should estop them to deny liability on account of the business so done. We have found that it was not authorized, and that the plaintiffs should not be compelled to contribute to pay the losses sustained by it.

VIII. The appellees have urged various objections to the organization and proceedings of the company, and the validity of the assignment and assessment, which appear to have been of minor importance. Some of them relate to a failure to observe a part of the requirements of chapter 4 of title 9 of the Code, and are disposed of by what we have already said, and others do not appear to have any foundation in the record.

It is claimed that the by-laws were not properly adopted. The records of the proceedings of the company are shown to be incomplete, but it appears that by-laws were published, and in all respects treated by the company and its officers as in force. We find no reason to conclude that they were not properly adopted.

The claim that the assignment was fraudulent, and that the company was not insolvent when it was made, is not supported by the evidence. The guaranty fund was not, strictly speaking, assets of the company for the purpose of determining its solvency, and would not have been had the subscribers not terminated their liability, for the reason that the company was required to refund all money obtained from it. It is clear that the company was

insolvent when the assignment was made, and that it was made in good faith, for a sufficient cause.

The insolvency of the company and its assignment for the benefit of creditors did not have the effect to terminate the obligation of the plaintiffs to contribute to the payment of losses which had occurred prior to the assignment. On the contrary, their liability to pay assessments made to meet such losses and expenses remained unimpaired, for the reason that until that time the contract of insurance was in all respects in force. See *Insurance Co. v. Prossee,* 11 Iowa, 115; *Com. v. Massachusetts Mut. Fire Ins. Co.,* 112 Mass. 120; *Doane v. Insurance Co.,* 43 N. J. Eq. 531 [11 Atl. Rep. 739]; May Ins. sections 593, 594.

The articles of incorporation and by-laws do not require that notice of assessments be given before they are made, and no notice of that kind was required to be given by the court. See *Wardle v. Cummings,* 49 N. W. Rep. (Mich.) 212; May, Ins. section 593.

IX. Our conclusion is that the deposit notes of the plaintiffs are valid obligations, subject to assessment for losses covered by assessment policies, which occurred prior to the assignment of the company for the benefit of its creditors, and for expenses, but that the assessments can be made and collected only according to the terms of the obligations. By the statutes of this state, the assignee is at all times subject to the order and supervision of the proper court and judge, and, subject to such order and supervision, has as full power and authority to receive, sue for, and recover property of the estate of the assignor, and to dispose of it as the latter had at the time of the assignment. Code, sections 2123, 2127. The power of the assignor to control and dispose of the property assigned is transferred by assignment to the assignee, subject to the order and supervision of the

court and judge, and subject to the regulations pre-
scribed by law. It is therefore proper for the court to
ascertain what assessments are required, and to order
them made as needed and as authorized by the obli-
gations assessed. The assessment made by the court
in May, 1891, was on an erroneous basis, and was
therefore properly set aside; but the court below erred
in deciding the obligations of the plaintiffs to be void,
and that they be canceled, and in enjoining all
attempts to collect, enforce or transfer them. The
petition did not ask relief in regard to the assessment
made by the board of directors in September, 1891,
and the court therefore erred in setting it aside,
although we do not hold that it was legal. The cause
will be remanded, with directions to the district court
to proceed in harmony with this opinion. The decree
rendered by it is *reversed*.

Granger, J.—I concur in the conclusions in this
case, but I do not wish to be understood as concurring
in a holding, under section 2549, that a party may
appear for another having similar interests, unless
such appearance is in some way authorized.

Kinne, J. (dissenting).—I cannot concur in the
result reached in this case, nor am I content with the
view of the sixth division of the opinion touching the
question of the fraud practiced upon plaintiffs. The
question is there treated as though the fraud pleaded
and relied upon to avoid the obligations of plaintiffs
had been practiced upon them after they in fact
became members of the company. Such is not the
case. The fraud relied upon was prior to the time
they became members of the company. It is claimed
to have been by reason of the alleged fraudulent rep-
resentations that plaintiffs were induced to become
members of the company. Now, as to such fraud, no

presumption arises or obtains that plaintiffs had knowledge of the articles and by-laws, and they are in no manner concluded or bound thereby; therefore the cases cited have no application. The rule contended for by the majority only applies as to fraud practiced after plaintiffs had become members of the company. Such are not the facts in this case.

Deemer, J., concurs with Kinne, J., in what is said regarding the sixth division of the opinion.