Merrimack, }
April 11, 1903. }

STATE & a. v. SUNAPEE DAM CO. & a.

Costs cannot be imposed, except as terms, until the action is finally disposed of.

Whether persons injured by an unreasonable exercise of the right of flowage may by amendment and against the objection of the defendants be made plaintiffs in an action brought by others who have suffered damage from the same wrong, is a question to be determined when those thus sought to be made parties ask for leave to appear.

Upon the questions of law arising on other exceptions taken to the rulings of the superior court, the justices sitting in the case were equally divided in opinion.

BILL IN EQUITY. The facts appear in the opinions.

*Edwin G. Eastman*, attorney-general, and *Sargent, Niles & Morrill*, for the plaintiffs.

*Ira Colby* and *Albert S. Wait*, for the defendants.

REMICK, J. (BINGHAM, J., *concurring*.) Lake Sunapee is about ten miles in length and varies in width from one half mile to three miles, and is one of the leading summer resorts in the state. About 1821, the defendants, by authority of the legislature, constructed and have since maintained a dam at the outlet of the lake, by means of which they draw water from the lake to supply power to mills below. The complainants are the numerous riparian proprietors whose estates bound the lake; various owners of steamboats, launches, boats, wharves, landings, and boat-houses, employed in navigation of the lake; and the state, as owner of a fish hatchery on its shores and trustee for the public of the right of fishery in its waters.

The bill was filed March 17, 1898, and charged, in substance, that the defendants had made, and were threatening to make, an unreasonable use of the waters of the lake, as against the plaintiffs; and had thereby inflicted, and were threatening to inflict, irreparable injury upon the plaintiffs. The prayer was for an injunction and for general relief. The answer was, in substance, a denial of the unreasonable use alleged. The trial court ordered the case to a referee to find the facts. Upon the facts reported, the case was transferred to the supreme court. Upon the case thus transferred, the law governing the rights of the parties was declared. It was also decided that the plaintiffs were entitled to

" an assessment of compensatory damages " on account of unreasonable use of the water in 1897. But the court, thinking, evidently, that a repetition by the defendants of the wrongs complained of was improbable after judicial declaration of the law of the case, concluded, in the exercise of discretion, to withhold " at this time " equitable relief " by way of injunction." *State* v. *Sunapee Dam Co.*, 70 N. H. 458, 463. There was, however, no order for the dismissal of the bill. The only order was " Case discharged," which left the bill in control of the superior court for such further proceedings, in conformity with the opinion, as should seem proper. Thereupon the defendants moved, in the superior court, that the bill be dismissed. The motion was denied, and the defendants excepted. The plaintiffs then moved (1) that a master be appointed to assess the damages to which the supreme court had declared them to be entitled; (2) that all persons claiming to have suffered by the unreasonable use of 1897 have leave to appear as plaintiffs; (3) that costs be awarded to the plaintiffs in the main action. The motion was granted, and the defendants excepted. The case is before us upon these exceptions.

The difficulty encountered is over the order for a master to assess damages. Upon this question the court are equally divided. *Bingham*, J., and myself are of the opinion that the superior court committed no error in granting the plaintiff's motion in this respect. The chief justice and *Chase*, J., are of the contrary opinion. *Walker*, J., does not sit. Under these circumstances there can be no authoritative decision, except for the purposes of this case. But as the result of our attitude is to affirm the order of the superior court in the disputed particular as effectually, so far as concerns the present case, as if it were done by the concurrence of all the judges (*State* v. *Perkins*, 53 N. H. 435; *Lathrop* v. *Knapp*, 37 Wis. 307; *Kolb* v. *Swan*, 68 Md. 516; *Durant* v. *Essex Co.*, 101 U. S. 555; *Hartman* v. *Greenhow*, 102 U. S. 672, 676), it is due to the parties and seems to be required by law (Laws 1901, *c.* 78, *s.* 4) that we should file an opinion.

It has been contended (1) that equity is without jurisdiction to assess the damages—that it must be done at law; (2) that if it can be done in equity, it is the constitutional right of the defendants to have it done by a jury; and (3) that in any event the motion for a master should have been denied and the assessment sent to a jury as a matter of discretion or practice, and that in this view, as well as upon the ground of constitutional right, the action of the superior court in granting the plaintiffs' motion should be reversed.

I. That damages may be assessed in equity, the court otherwise having jurisdiction, in order " to do complete justice " and

accomplish "final determination," is firmly established. *Dennett* v. *Dennett*, 43 N. H. 499, 503; *Chartier* v. *Marshall*, 51 N. H. 400; *S. C.*, 56 N. H. 478; *Carpenter* v. *Fisher*, 68 N. H. 486, 493; *Ellis* v. *Association*, 69 N. H. 385, 389; *Winslow* v. *Nayson*, .113 Mass. 411, 421, 422; *Cathcart* v. *Robinson*, 5 Pet. 264, 278. The vital question then is: Did equity have jurisdiction of the present case at the time the assessment in question was ordered? It has been authoritatively declared that "the present proceeding is to restrain an alleged infringement of public and private rights in and to the waters of the lake, through changes in the water level occasioned by the maintenance of the defendants' dam and works, and is instituted under the general equity powers of the court, and particularly under section 3, chapter 205, of the Public Statutes." *State* v. *Sunapee Dam Co.*, 70 N. H. 458, 459. In form, at least, the proceeding is in equity, and all that has been done to the present time has been according to the course in equity. That the proceeding is also one of equitable cognizance, not alone under the statute, but "when tested by the general principles of equity," is an irresistible conclusion from the facts and circumstances shown by the record before us.

The fundamental fact to be observed in this connection is that the parties, plaintiffs and defendants, all had rights in the waters of Lake Sunapee, which they could vindicate in a proper action. *Clement* v. *Burns*, 43 N. H. 609, 616; *Conn. River Lumber Co.* v. *Company*, 65 N. H. 290, 390, 392; *Concord Mfg. Co.* v. *Robertson*, 66 N. H. 1, 11, 18, 19, 20, 23; *Aborn* v. *Smith*, 11 R. I. 594; *Cedar Lake Hotel Co.* v. *Company*, 79 Wis. 297, 302; 1 Spell. Inj. & Ex. Rem., s. 518; Gould Wat. (2d ed.), ss. 148, 149. The defendants' charter did not give them the exclusive right. The act contains no express terms to that effect, and a legislative intent to make absolute surrender of the public right of fishery and navigation, and of the riparian rights of the shore-owners will not be implied. *Conn. River Lumber Co.* v. *Company*, 65 N. H. 290, 291, 375, 379, 380; *Commonwealth* v. *Essex Co.*, 13 Gray 239, 248; *Commissioners* v. *Company*, 104 Mass. 446, 450. The act in terms limits the power of the company to raise the waters of the lake, by restricting the height of the dam to low-water mark; and they are still further limited, by implication of law, to a reasonable use of the water, even within their charter limits. *State* v. *Sunapee Dam Co.*, 70 N. H. 458, 461, 463. Another fact important to be borne in mind is that although the plaintiffs and defendants each had rights in the lake, their extent had not been defined and limited, nor the proper mode of exercising and enjoying them ascertained and determined, at the time the plaintiffs filed their bill. They lay in common and confusion, with no boundary but the

law's unapplied and indefinite boundary of reasonable use. *Gardner* v. *Webster*, 64 N. H. 520, 522, 523; *Conn. River Lumber Co.* v. *Company*, 65 N. H. 290, 291, 390, 392; *Concord Mfg. Co.* v. *Robertson*, 66 N. H. 1, 11, 18, 19, 20, 22, 23; *State* v. *Sunapee Dam Co.*, 70 N. H. 458, 461, 463; *Aborn* v. *Smith*, 11 R. I. 594. As a result, the defendants had repeatedly encroached upon the rights of the plaintiffs and their grantors, inflicting upon them manifestly irreparable injury. The extent, character, and frequency of these encroachments and injuries will appear from the following extracts from the report of the referee: "The natural variation of the level of the lake . . . was not perceptibly changed by the erection and maintenance or management of the defendants' dam, prior to its reconstruction in 1851," and the use of the dam by the defendants during that period was "without any apparent objection on the part of those under whom the plaintiffs now hold or claim, or others, except when the height of the water was increased by the addition of flashboards, which occurred about 1845, and resulted in the flowing of the land of shore-owners." "The defendant corporation, in 1851, . . . reconstructed the dam. . . . The result of changes made at this time, and the addition of planks or flashboards creating a higher level of the water, caused injury to property owners upon the shores, by the flowage of their lands." Some of them subsequently brought suits therefor, and received compensation through an adjustment made with them by the defendants involving the "acknowledgment of liability." "In 1859, one Gardner made claim for flowage. The corporation authorized the settlement of his claim. Aside from the records of the corporation in 1861, in which there was a recognition that other claims had been before made and adjusted, and occasional complaints which took no tangible form, there was no other complaint, or evidence of complaint, of the defendant corporation's misuse or mismanagement of the water of the lake until about 1882." In 1880 or 1881, "in consequence of . . . the negligence and the improper manner in which the servants of the defendant corporation managed the flow of the water through the dam, . . . the rights of the shore-owners . . . were impaired, and navigation upon the lake was rendered inconvenient and dangerous. This condition resulted in complaint . . . by those having homes, cottages, and hotels upon the shores, and a steamboat upon the lake. . . . This complaint and the resulting agitation . . . resulted in an act of the legislature (chapter 145, Laws of 1883) authorizing the governor and council to appoint a commissioner to take evidence and report facts to the legislature. . . . As a result of this investigation, better management of the water from the lake

through the dam was not only promised, but secured." "Among the concessions made by the defendant corporation to the complainants" at this time, were certain changes in the by-laws of the corporation, whereby it was provided "that a member of the board of directors should be resident in the town of Sunapee, the location of the dams and works of the corporation," and that "in controlling the gates the object shall be to hold back and draw out the waters of Sunapee lake in such manner as will equalize the flow of the water the year around (as near as it can be accomplished by man), . . . unless the said directors shall unanimously agree upon a more judicious manner to manage them." "Mr. Flanders, a person acceptable to the company, the shore-owners, and steamboat proprietors, . . . was employed by the corporation to manage the water at the dam. . . . By the exercise of care and the necessary watchfulness, he secured a comparatively even level of the water, and avoided just ground of complaint." In June, 1896, " he was superseded by Mr. Abbott, who was managing the dam for the defendant corporation at the time of the hearing before the referee." About the time Flanders was superseded by Abbott, the by-law providing for a resident director and an equalized flow of the water was rescinded, "in disregard of the arrangement entered into with those interested in the shores and waters of Lake Sunapee in 1886." "During the spring and summer of 1897, especially in May and June, . . . . the level of the lake was . . . raised by putting additional plank upon the dam. . . . The effect of this management of the dam was to raise the water of the lake to such an extent as to submerge the wharves, . . . flood some cellars upon the shores, and wash and injure beaches upon the properties, respectively, of the plaintiffs Quackenbos and Hay, and injuriously affect the state's fish hatchery on the shore of the lake. . . . The defendant corporation has . . . at different times, by the management of its dam and gates, drawn the waters of the lake so low that navigation by steamers has been inconvenient and dangerous at certain points on established routes; and at low water, thus caused, the shores of the lake at occupied places have become unsightly and unwholesome; and, too, the lake when its level is thus lowered is rendered much less useful for the propagation of fish by the state authorities." In short, "Mr. Abbott, the agent selected by the defendant corporation in June, 1896, did not manage and control the waters of the dam in a reasonable and proper manner, especially during May and until June 12, 1897."

After such a record of recurring disputes and collisions concerning the measure and use of the rights of the parties, covering

a period of about fifty years; after the futility of suits at law had
been demonstrated by repeated actions and settlements, followed
by repeated mismanagement; after the defendants had repudiated
a basis of operation conceded as a result of the complaints and
legislative inquiry growing out of the mismanagement of 1880
and 1881; after they had installed in place of Mr. Flanders, who
"secured a comparatively even level of the water and avoided
just ground for complaint," Mr. Abbott, who "did not manage
and control the waters of the dam in a reasonable and proper
manner"; after the defendant corporation had "at different times,
by the management of its dam and gates, drawn the waters of the
lake so low that navigation by steamers" was rendered "incon-
venient and dangerous," the shores of the lake unsightly and
unwholesome, and the lake "much less useful for the propagation
of fish by the state authorities"; and especially after the mis-
management of May and June, 1897, the effect of which was
"to raise the water of the lake to such an extent as to submerge
the wharves of the steamboats, as well as those of others, to injure
and destroy some of those wharves, flood some cellars upon the
shores, and wash and injure beaches upon the properties, respec-
tively, of the plaintiffs Quackenbos and Hay, and injuriously
affect the state's fish hatchery on the shore of the lake,"—it hardly
seems necessary to say that the action of the complainants in
seeking a court of equity was neither premature nor inappropriate,
particularly in view of the conclusion of the court that the
defendants' dam was being maintained "two feet above the point
authorized by their charter," and the findings of the referee that
"injury to the plaintiffs and others with like rights . . . may
be avoided by the exercise of reasonable care in the management
of the defendants' dam," and, in effect, that a practically reason-
able use can be secured to all by proper regulation. *Patten* v.
*Marden*, 14 Wis. 473, 476. Jurisdiction of equity under such
circumstances cannot admit of doubt.

(1) It rests primarily upon the well established ground of
equity jurisdiction "to determine, as between parties having
admitted legal rights in bodies of water, the extent of their
respective rights and the proper mode of exercising and enjoying
them," a ground of equity jurisdiction existing at and before the
adoption of the constitution, and still existing. *Burnham* v.
*Kempton*, 44 N. H. 78, 100; *Ranlet* v. *Cook*, 44 N. H. 512, 515;
*Bean* v. *Coleman*, 44 N. H. 539, 542; *Conn. River Lumber Co.* v.
*Company*, 65 N. H. 290, 291, 361, 390, 391, and authorities cited;
*Lyon* v. *McLaughlin*, 32 Vt. 423, 426; *Bemis* v. *Upham*, 13 Pick.
169, 171; *Ballou* v. *Hopkinton*, 4 Gray 324, 328; *Aborn* v. *Smith*,
11 R. I. 594; *Robinson* v. *Byron*, 1 Bro. Ch. 588; *Universities* v.

*Richardson,* 6 Ves. Jr. 689 ; *Lane* v. *Newdigate,* 10 Ves. Jr. 192 ; Gould Wat., *s.* 540.

The wisdom and propriety of such a jurisdiction are manifest; but after the adjudications to which attention has been called, and especially after the exhaustive briefs, arguments, and opinion in *Conn. River Lumber Co.* v. *Company,* which cover the whole subject with great thoroughness and ability, we do not feel called upon to defend the jurisdiction on fundamental grounds.

(2) But the jurisdiction of equity in the present case rests as firmly upon another ground—the prevention of a multiplicity of suits. Whatever may be said against this as an independent ground of jurisdiction in some cases and under some circumstances (*Tribette* v. *Railroad,* 70 Miss. 182, 190), in view of the subject-matter, the nature of the controversy, the character of the rights involved, the great number of parties affected by the defendants' mismanagement of the dam, the impracticability of a separate suit at law in behalf of each, and the proven futility of such suits to accomplish the ends of justice, it cannot admit of doubt that this ground fully sustains the jurisdiction of equity in the present case. Nor is it a recently discovered ground of jurisdiction. It existed long before the New Hampshire constitution was adopted, when it was adopted, and still exists, and it is nowhere more distinctly recognized and firmly established than in this jurisdiction. *Walker* v. *Cheever,* 35 N. H. 339, 351 ; *Smith* v. *Bank,* 69 N. H. 254 ; *Carlton* v. *Newman,* 77 Me. 408 ; *Lockwood* v. *Lawrence,* 77 Me. 297 ; *Ballou* v. *Hopkinton,* 4 Gray 324 ; *Cadigan* v. *Brown,* 120 Mass. 493, 495 ; *New York etc. R. R.* v. *Schuyler,* 17 N. Y. 592, 608 ; *Supervisors* v. *Deyoe,* 77 N. Y. 219 ; *Chicago* v. *Collins,* 175 Ill. 445, 451, 452, 453 ; *Corey* v. *Sherman,* 96 Ia. 114 ; *Keese* v. *Denver,* 10 Col. 112, 123, 124 ; *Osborne* v. *Railroad,* 43 Fed. Rep. 824, 826, 827 ; *Cowper* v. *Clerk,* 1 P. Wms. 155, 157 ; *Mayor* v. *Pilkington,* 1 Atk. 282 ; *Tenham* v. *Herbert,* 2 Atk. 483 ; *Jesus College* v. *Bloome,* 3 Atk. 262, 263 ; *Sheffield Waterworks* v. *Yeomans,* L. R. 2 Ch. 8, 12 ; 1 Pom. Eq. Jur., *s.* 243 ; Whitehouse Eq. Pr., *s.* 136 ; Black's Pom. Wat., *s.* 169.

(3) Finally, upon the facts appearing in the record equity had jurisdiction, upon the ground of nuisance,—a ground of equity jurisdiction which has been distinctly traced back to the reign of Queen Elizabeth, and which was firmly established in the jurisprudence of the mother country at the time of the adoption of our constitution. *State* v. *Saunders,* 66 N. H. 39, 81, 82.

That the dam, two feet higher than the defendants' charter authorized (*State* v. *Sunapee Dam Co.,* 70 N. H. 458, 461), and used and managed in the manner and with the results alleged and

found, was a nuisance, cannot admit of doubt. That its continuance was threatened on the day the bill was filed, was an unavoidable inference (1) from the fact that the dam was still in use by the defendants, for the same purposes, under the same management, and at the same unauthorized height; (2) from the fact that the by-law, previously conceded by the defendants as a guaranty against future mismanagement and under which injury to the plaintiffs had been avoided, stood rescinded, "in disregard of the arrangement entered into with those 'interested in the shores and waters of Lake Sunapee"; and (3) from the fact that at intervals throughout a period of nearly fifty years, and "at different times" during the immediate administration of Abbott, including the summer of 1897, the defendants had so used the dam as to infringe upon the rights of the plaintiffs and their predecessors, and this in spite of repeated suits and settlements, "involving acknowledgment of liability." That the injuries threatened were irreparable, sufficiently appeared from the character of the injuries already suffered, as detailed by the referee, including peril to life from endangered navigation and menace to health from unwholesome conditions. That the injuries were of periodic instead of constant occurrence, was no objection to the jurisdiction (*Ross* v. *Butler*, 19 N. J. Eq. 294; 1 Spell. Inj. & Ex. Rem., *s.* 392; Wood Nuis., *s.* 780), especially in view of their irreparable character and the demonstrated futility of suits at law and legislative investigations and adjustments to prevent their recurrence. That equity was not bound, under the circumstances of the present case, to await an action at law, is also clear. The plaintiffs having rights in Lake Sunapee in common with the defendants as an undoubted and unquestioned proposition of law, and the question of right involved in the case being a mere matter of partition and regulation, and not of title, "there is no question of right or title in the sense in which those words are used when it is said that the legal right must be established at law before it is specifically enforced in equity." *Conn. River Lumber Co.* v. *Company*, 65 N. H. 290, 392. Furthermore, if there was any legal right involved, in the sense material in this connection, it had been established by the suits at law, settlements, and "acknowledgment of liability" already referred to.

Finally, the multiplicity of actions necessary on account of the numerous parties concerned, and the irreparable nature of the injuries threatened, gave the court immediate jurisdiction, whatever legal right may have been involved. *Smith* v. *Bank*, 69 N. H. 254; *Lockwood* v. *Lawrence*, 77 Me. 297, 311, 314; *Wheelock* v. *Noonan*, 108 N. Y. 179, 185, 187; *Tenham* v. *Herbert*, 2 Atk. 432;

1 Harv. Law Rev. 126, 127 ; 1 Spell. Inj. & Ex. Rem., *ss.* 402, 403 ; and numerous authorities already cited on the subject of multiplicity of actions as a ground of equity jurisdiction. Thus, in every view, equity had jurisdiction of the bill for the purpose of dealing with nuisance. To say that equity has jurisdiction to enjoin the owner of animals from permitting them to pass from his own land over the uninhabitated wood and pasture lot of another, as was done in *Ellis* v. *Association,* 69 N. H. 385, and to enjoin the claimant of a share in a campmeeting tent from repeated occupation of the same with the plaintiff during campmeeting seasons, as was done in *Ford* v. *Burleigh,* 60 N. H. 278, and yet deny the jurisdiction of the court in a case like the present, where the rights of so many were involved and the injuries complained of so persistent, serious, and far-reaching, affecting not only property but life and health, would be to substitute caprice for established principles as the test of equity jurisdiction.

But it is suggested that if equity had jurisdiction at the outset upon the ground of nuisance, the jurisdiction was ousted by the denial of the injunction. This would by no means follow, even if nuisance had been the sole ground of jurisdiction. It is apparent from the course of the trial and the findings of the referee, that the allegations as to nuisance and irreparable injury were made in good faith, and not for the mere purpose of tranferring the case from a court of law to a court of equity. *Whipple* v. *Fair Haven,* 63 Vt. 221 ; *Milkman* v. *Ordway,* 106 Mass. 232 ; *Case* v. *Minot,* 158 Mass. 577, 588 ; *Morss* v. *Elmendorf,* 11 Paige 277, 278 ; *Thorne* v. *French,* 4 N. Y. Misc. 436, 437 ; *Jones* v. *Bradshaw,* 16 Grat. 355 ; *Walters* v. *Bank,* 76 Va. 12 ; *Waite* v. *O'Neil,* 72 Fed. Rep. 348 ; *Gormley* v. *Clark,* 134 U. S. 338. Upon the facts reported, an injunction or some order regulating the use of the water as between the parties was clearly within the jurisdiction of the court. *Conn. River Lumber Co.* v. *Company,* 65 N. H. 290 ; *Concord Mfg. Co.* v. *Robertson,* 66 N. H. 1, 20 ; *Aborn* v. *Smith,* 11 R. I. 594 ; *Lawson* v. *Company,* 59 Wis. 393, 397 ; *Cedar Lake Hotel Co.* v. *Company,* 79 Wis. 297, 302 ; *Webb* v. *Company,* 3 Sumn. 189, 197, 198 ; 1 Spell. Inj. & Ex. Rem., *s.* 318 ; Gould Wat., *ss.* 510, 512. The fact that the court, in the exercise of its discretion (*Bassett* v. *Company,* 47 N. H. 426, 437 ; *State* v. *Saunders,* 66 N. H. 39, 60 ; *Russell* v. *Farley,* 105 U. S. 433, 438 ; *Clark* v. *Wooster,* 119 U. S. 322 ; Kerr Inj. 209, 210), believing, no doubt, that having declared the legal rights of the parties a regulating process might not be needed (*Conn. River Lumber Co.* v. *Company,* 65 N. H. 290, 392), chose to keep on the conservative side and withhold its restraining power, did not deprive it of jurisdiction of the bill for the purpose of affording relief by way of damages.

Jurisdiction, as spoken of with reference to the right of the court to administer full relief, does not depend upon the order of the court granting or denying the relief prayed (as that may proceed upon considerations entirely apart from the question of jurisdiction), but upon the essential character of the proceeding, as to being legal or equitable. When the case is one of equitable cognizance in its essential character, the right to grant full relief, legal as well as equitable, attaches with the jurisdiction, and is not defeated by denial of the specific relief asked. That the present case is one in equity in its essential character, the bill, answer, and referee's report conclusively establish. Being so, the right to grant full and complete relief was not lost because the court, as a matter of discretion, thinking that a repetition of the wrongs complained of was improbable after the judicial declaration it had made concerning the rights of the parties, saw fit to deny the prayer for injunction. *Pratt* v. *Law*, 9 Cranch 456, 493; *Cathcart* v. *Robinson*, 5 Pet. 264; *Watts* v. *Waddle*, 6 Pet. 389; *County* v. *Kimball*, 102 U. S. 691, 706, 707; *Clark* v. *Wooster*, 119 U. S. 322; *Omaha etc. R'y* v. *Company*, 32 Fed. Rep. 727; *Waite* v. *O'Neil*, 72 Fed. Rep. 348, 354, 355, 356; *Chartier* v. *Marshall*, 51 N. H. 400; *S. C.*, 56 N. H. 478; *Carpenter* v. *Fisher*, 68 N. H. 486, 493; *Whipple* v. *Fair Haven*, 63 Vt. 221; *Milkman* v. *Ordway*, 106 Mass. 232, 254; *Thompson* v. *Heywood*, 129 Mass. 401, 407; *Woodbury* v. *Company*, 145 Mass. 509, 512; *Brande* v. *Grace*, 154 Mass. 210; *Case* v. *Minot*, 158 Mass. 577, 578; *Morss* v. *Elmendorf*, 11 Paige 277, 278; *Phillips* v. *Thompson*, 1 Johns. Ch. 131, 149; *Parkhurst* v. *Van Cortlandt*, 1 Johns. Ch. 273, 286; *Woodcock* v. *Bennet*, 1 Cow. 711; *Cuff* v. *Dorland*, 55 Barb. 481, 496; *Valentine* v. *Richardt*, 126 N. Y. 272, 277; *Thorne* v. *French*, 4 N. Y. Misc. 436, 437, 438; *Hart* v. *Brown*, 6 N. Y. Misc. 238, 245; *Domschke* v. *Railway*, 74 Hun 442, 445; *Masson's Appeal*, 70 Pa. St. 26, 29; *Stearns* v. *Beckham*, 31 Grat. 379, 420, 421; *Walters* v. *Bank*, 76 Va. 12; *Evans* v. *Kelley*, 49 W. Va. 181; *Aday* v. *Echols*, 18 Ala. 353, 357; *Atkinson* v. *Felder*, 78 Miss. 83, 85; *Brown* v. *Gardner*, Harr. Ch. (Mich.) 291; *Holland* v. *Anderson*, 38 Mo. 55, 58; *Hedges* v. *Everard*, 1 Eq. Cas. Abr. 18, pl. 7; *London* v. *Nash*, 3 Atk. 512; *Cleaton* v. *Gower*, Finch 164; *Denton* v. *Stewart*, 1 Cox Ch. 258; *Greenaway* v. *Adams*, 12 Ves. Jr. 395; *Gwillim* v. *Stone*, 14 Ves. Jr. 128; 1 Beach Mod. Eq. Pr., s. 91; Pom. Cont., s. 474; 11 Am. & Eng. Enc. Law (2d ed.) 201.

Although, as shown, this was the rule in England at and prior to the adoption of our constitution, it was afterwards doubted. *Todd* v. *Gee*, 17 Ves. Jr. 273; *Blore* v. *Sutton*, 3 Mer. 257; *Jenkins* v. *Parkinson*,, 2 Myl. & K. 5, 12. To remove all doubt, it

was enacted (21 & 22 Vict., *c.* 27) that "in all cases in which the court of chancery has jurisdiction to entertain an application for an injunction against a breach of covenant, contract, or agreement, or against the commission or continuance of any wrongful act, or for the specific performance of any covenant, contract, or agreement, it shall be lawful for the same court, if it shall think fit, to award damages to the party injured, either in addition to or in substitution for such injunction or specific performance, and such damages may be assessed in such manner as the court shall direct." "This statute is held to apply only to cases which are of equitable cognizance in their essential character." *Durell* v. *Pritchard*, L. R. 1 Ch. 244. It was uncalled for except to remove doubts occasioned by decisions rendered long after the adoption of our constitution. The same authority conferred by the act belonged to the court, "as incident to its chancery jurisdiction and essential to the complete exercise of that jurisdiction." *Milkman* v. *Ordway*, 106 Mass. 232, 257.

True, many of the cases cited were where damages were assessed upon a bill for specific performance, after denial of the prayer for performance. But it can make no difference in principle whether the bill is to restrain or compel action. If relief by way of damage is permissible in one case, it must be in the other. To hold otherwise would introduce a distinction wholly technical and arbitrary. No such distinction is recognized by the courts of this country (*Whipple* v. *Fair Haven*, 63 Vt. 221; *Woodbury* v. *Company*, 145 Mass. 509; *Case* v. *Minot*, 158 Mass. 577, 588; *Thorne* v. *French*, 4 N. Y. Misc. 436, 437, 438; *Masson's Appeal*, 70 Pa. St. 26, 29; *Brown* v. *Gardner*, Harr. Ch. (Mich.) 291; *Omaha etc. R'y* v. *Company*, 32 Fed. Rep. 727); and the act of parliament to which reference has been made conclusively shows that while the courts of England may have disputed as to the fundamental question whether purely legal relief can be granted in any case where equitable relief is denied, no distinction is there recognized between bills for injunction and those for specific performance respecting the application of the rule under consideration. Both are put upon the same ground and made subject to the same rule. They are treated the same in this jurisdiction. *Chartier* v. *Marshall*, 51 N. H. 400; *S. C.*, 56 N. H. 478; *Carpenter* v. *Fisher*, 68 N. H. 486, 493.

But if it were true that a bill for injunction, brought in however good faith, upon whatever state of facts, to restrain a nuisance, can afford no jurisdictional basis for relief by way of damages, after a denial, for whatever reason, of the prayer for injunction, the rule would have no application in the present case, because in this case after the denial of the injunction the jurisdiction

was still supported by the two grounds first named. Having juris-
diction for the purpose of determining by specific decree the extent
of the respective water rights of the contending parties, and the
proper mode of exercising and enjoying them (*Burnham* v. *Kemp-
ton*, 44 N. H. 78, 79; *Conn. River Lumber Co.* v. *Company*, 65
N. H. 290, 390, 392; *Concord Mfg. Co.* v. *Robertson*, 66 N. H. 1,
20), and also to prevent a multiplicity of suits (*Burnham* v. *Kemp-
ton*, 44 N. H. 78; *Smith* v. *Bank*, 69 N. H. 254), equity was not
ousted of its jurisdiction upon these grounds merely because
another distinct and independent ground of jurisdiction failed.
Nor did denial of the specific prayer for injunction leave the court
with a jurisdiction it was powerless to exercise. The general
prayer for such further relief as may be just was sufficient for any
decree appropriate to the case as presented by the bill, answer, and
report.   " The rule is that if the complainant on the facts   .   .   .
is entitled to any equitable relief whatever, and there is a prayer
for general relief, this may be granted, even if the special relief
claimed be not warranted by the facts, or if he mistakes the prin-
ciples of equity upon which his right to relief is founded."
*Junior etc. Ass'n* v. *Sharpe*, 63 N. J. Eq. 500.   See, also, *Tread-
well* v. *Brown*, 44 N. H. 551; *Winslow* v. *Nayson*, 113 Mass. 411;
*Hill* v. *Beach*, 1 Beas. 31, 35; *Rutherford* v. *Jones*, 14 Ga. 521,
525; *Watts* v. *Waddle*, 6 Pet. 389; *Omaha etc. R'y* v. *Company*,
32 Fed. Rep. 727; Sto. Eq. Pl., *s.* 40; 1 Beach Mod. Eq., *s.* 91.
If there is anything in *Bassett* v. *Company*, 43 N. H. 249, which
forbids assessment of damages in equity under such circumstances
as are presented in this case, it is contrary to *Chartier* v. *Marshall*,
51 N. H. 400,—*S. C.*, 56 N. H. 478, *Carpenter* v. *Fisher*, 68 N. H.
486, 493, and the great weight of authority.

Whatever the court in its discretion saw fit to do as to granting
or withholding the injunction prayed for, it is clear, not alone from
the allegations of the bill, but from the facts found by the referee,
that equity had jurisdiction of the case.   Jurisdiction having
attached, and the court having proceeded to determine every other
question involved, it should now go forward and assess the dam-
ages; in other words, in the language of *Marshall*, C. J., "go on
to do complete justice" (*Cathcart* v. *Robinson*, 5 Pet. 264, 278),
or, in the language of *Carpenter*, C. J., dispose "of all questions
the decision of which is necessary to its final determination."
*Carpenter* v. *Fisher*, 68 N. H., 486, 493.   This course is so clear
in principle and so reasonable in practice, the suggestion to con-
vert the proceedings by amendment into several actions at law, in
order to have the damages assessed, seems idle.   *Smith* v. *Bank*,
69 N. H. 254.

II.   But, it is said, assuming that the damages may be assessed

in equity, nevertheless, the defendants, as against those plaintiffs who claim more than $100, have a constitutional right to an as-sessment by jury trial.

That there is no constitutional right to a jury trial in equity was conclusively settled, so far as this jurisdiction is concerned, in *Conn. River Lumber Co.* v. *Company*, 65 N. H. 290, 379, 391, and *State* v. *Saunders*, 66 N. H. 39, 71, 72, 78, 79, 80, 89, 90, 91, if, indeed, it was not previously settled. *Copp* v. *Henniker*, 55 N. H. 179, 210, 211; *Perkins* v. *Scott*, 57 N. H. 55, 81; *Bellows* v. *Bellows*, 58 N. H. 60; *Sargent* v. *Putnam*, 58 N. H. 182; *Proctor* v. *Green*, 59 N. H. 350, 352; *Davis* v. *Dyer*, 62 N. H. 231, 236; *Parker* v. *Simpson*, 180 Mass. 334; *Shapira* v. *D'Arcy*, 180 Mass. 377; *Ward* v. *Farwell*, 97 Ill. 593, 612, 613; *Littleton* v. *Fritz*, 65 Ia. 488; *Barton* v. *Barbour*, 104 U. S. 126; *Gormley* v. *Clark* 134 U. S. 338, 348, 349.

"Of course, it would not be competent for the legislature to defeat the right of trial by a jury in common-law cases by simply declaring they might be tried in courts of chancery, and that the proceedings therein should conform to the proceedings in chancery causes. This would simply be an attempted evasion of the pro-visions of the constitution. Where a new class of cases are, by legislative action, directed to be tried as chancery causes, it must appear that, when tested by the general principles of equity, they are of an equitable character, and can be more properly tried in a court of equity than in a court of law. And if of this character, when brought in a court of equity they stand upon the same foot-ing with other causes, and the court will have the right, as in other cases, to determine all questions of fact without submitting them to a jury." *Ward* v. *Farwell*, 97 Ill. 593, 613, 614; *Gorm-ley* v. *Clark*, 134 U. S. 338, 347, 348, 349.

Assessment of damages in equity, the court otherwise having jurisdiction, stands no different with regard to the constitutional right of trial by jury than any ordinary issue in equity. "The cases are numerous in which the court of chancery has caused damages to be assessed, either by an issue or by a master." *Phil-lips* v. *Thompson*, 1 Johns. Ch. 131, 151. "Chancery has directed damages to be assessed in either way, at discretion, for nearly two centuries, at least from 1660 to the present day." *Woodcock* v. *Bennet*, 1 Cow. 711, 727. "The practice has been almost, if not quite, universal to regard the question of damages in equity cases as so incidental to the principal relief demanded that it was wholly within the discretion of the trial court to determine whether or not an issue should be framed to have it tried by jury. After a care-ful search, but one case has been found in which the claim was directly made that such issue must be tried by jury, and in that

case it was denied." 15 L. R. A. 287. See, also, *Carpenter* v. *Fisher*, 68 N. H. 486, 493, and numerous authorities already cited.

III.  This brings us to the third contention, viz., that although the defendants may have no constitutional right to an assessment by jury, the court should, as matter of discretion or practice, have ordered an assessment by that method as to all claims in excess of $100.  If it were the province of this court to revise the action of the superior court in matters of discretion, we should say, under the circumstances of the present case, that the discretion was reasonably exercised.  Under the circumstances, a master or referee was deemed appropriate to try the fundamental issue of reasonable use, and no logical reason appears why a tribunal suitable in the judgment of the parties and the court to try this primary question of fact should be unsuitable for the purpose of merely assessing the incidental damages.  *Chase* v. *Lovering*, 27 N. H. 295, 297; *Carpenter* v. *Fisher*, 68 N. H. 486, 493; *Lynch* v. *Railway*, 129 N. Y. 274, 283, 284.  The idea of impanelling a separate jury and going through the expensive process of such a trial in each of the numerous claims possible under the bill, merely to assess damages, does not appeal to the judgment and is condemned by authority.  *Carpenter* v. *Fisher*, 68 N. H. 486; *Smith* v. *Bank*, 69 N. H. 254.  Convenience, economy, and the practical administration of justice, all argue in favor of a master; and it does not appear how any substantial right of the parties can be prejudiced by this course.

But whether assessment by master would better serve the ends of justice than an assessment by jury, is not for us to decide. Presumably, the arguments for and against both methods of assessment were presented to the presiding justice in the superior court. He has decided in favor of the former.  It was his right to so decide.  Sitting in equity, he was the chancellor.  From the earliest, down to the present time, it has been the province of the chancellor to determine according to his own discretion how he would inform his conscience, whether by personal hearing, reference to a master, or by framing issues to the jury.  *Tappan* v. *Evans*, 11 N. H. 311, 334; *Proctor* v. *Green*, 59 N. H. 350, 354; *State* v. *Saunders*, 66 N. H. 39, 78, 79; *Briggs* v. *Shaw*, 15 Vt. 78, 81; *Parker* v. *Simpson*, 180 Mass. 334; *Phillips* v. *Thompson*, 1 Johns. Ch. 131, 150; *Parkhurst* v. *Van Cortlandt*, 1 Johns. Ch. 273, 285; *Smith* v. *Carll*, 5 Johns. Ch. 118, 119; *Dale* v. *Roosevelt*, 6 Johns. Ch. 255; *Woodcock* v. *Bennet*, 1 Cow. 711, 713, 727, 755, 756; *Candee* v. *Lord*, 2 N. Y. 269,—51 Am. Dec. 294, 298, and note; *Scheetz's Appeal*, 35 Pa. St. 88; *Keith* v. *Henkleman*, 173 Ill. 137; *Field* v. *Holland*, 6 Cranch 8, 22; *Barton* v. *Barbour*, 104 U. S. 126, 133, 134; *Idaho etc. Co.* v. *Bradbury*, 132

U. S. 509, 515, 516; *Kohn* v. *McNulta*, 147 U. S. 238, 240; *Hedges* v. *Everard*, 1 Eq. Cas. Abr. 18, pl. 7; *Cleaton* v. *Gower*, Finch 164; *Denton* v. *Stewart*, 1 Cox Ch. 258; *Bullen* v. *Michel*, 2 Price 399; *O'Connor* v. *Cook*, 6 Ves. Jr. 665, 671; *Warden of St. Paul's* v. *Morris*, 9 Ves. Jr. 155, 166, 168; *Pearce* v. *Creswick*, 2 Hare 286, 297; *Roskell* v. *Whitworth*, L. R. 5 Ch. 459, 463, 464; 3 Gr. Ev., s. 261; Bisp. Eq. 17; 2 Am. Dig. (Cent. ed.) 1213.

That the chancellor's discretion in ordering the damages to be assessed by a master instead of by a jury is not subject to exception is well established. *Tappan* v. *Evans*, 11 N. H. 311, 334; *Proctor* v. *Green*, 59 N. H. 350, 354; *Briggs* v. *Shaw*, 15 Vt. 78; *Ward* v. *Hill*, 4 Gray 593; *Crittenden* v. *Field*, 8 Gray 621, 626; *Candee* v. *Lord*, 2 N. Y. 269,—51 Am. Dec. 294, and note 299; *Brinkley* v. *Brinkley*, 56 N. Y. 192; *Sheetz's Appeal*, 35 Pa. St. 88, 94; *Hammond* v. *Foreman*, 43 S. C. 264; *Adams* v. *Munter*, 74 Ala. 338, 342; *Cook's Heirs* v. *Bay*, 4 Miss. 485, 491; *Maynard* v. *Richards*, 166 Ill. 466; *Weil* v. *Kume*, 49 Mo. 158, 159; *Lake* v. *Tolles*, 8 Nev. 285, 286, 291; *Idaho etc. Co.* v. *Bradbury*, 132 U. S. 509, 516.

*Tasker* v. *Lord*, 64 N. H. 279, and *State* v. *Saunders*, 66 N. H. 39, decide nothing to the contrary. In neither of these cases was the court called upon to overrule the decision of the court below. In each case the question whether there should be a jury trial was presented for the first time in the law court. In neither was it suggested that there was a constitutional right to such a trial, or that it was not within the discretion of the chancellor to try the questions himself, or that the law court could overrule the chancellor's discretion as to the mode in which he would inform his conscience. On the contrary, in *State* v. *Saunders* constitutional right is expressly denied, and nothing more than the propriety of a jury trial was asserted in either case. The true understanding of the court, as then constituted, as to its province in such case, is disclosed in *Proctor* v. *Green*, 59 N. H. 350, 354, and is in exact accordance with the views we entertain, viz., that the granting of jury trial in equity is a matter resting entirely in the discretion of the chancellor.

It was natural under the old system, when the law and trial courts were all one in personnel, that suggestions concerning the mode of exercising discretionary powers should emanate from the former for the guidance of the latter. *Ellensohn* v. *Keyes*, 39 N. Y. Supp. 774, 775. But instances of suggestion of this sort by the law to the trial court, under a system so interrelated, can hardly be regarded as precedents warranting this court in overruling the superior court in matters of pure discretion, under a system designed to secure the independence of each court within

the sphere of its jurisdiction. Whatever liberty may have been taken by way of regulating discretion under the old system, under the present system we think that in matters of mere discretion the action of the superior court, unless reserved for our consideration, should be subject to revision for abuse only. *Dale* v. *Roosevelt*, 6 Johns. Ch. 255; *Candee* v. *Lord*, 2 N. Y. 269; *Roskell* v. *Whitworth*, L. R. 5 Ch. 463, 464, 465. Consistently adhered to, this policy will commend and justify itself, and conduce to the practical administration of justice. But if exceptions are made, it will be impossible to draw a satisfactory line; inconsistencies and contradictions will inevitably ensue, and the rule itself will come to be regarded as a makeshift. It should be consistently enforced, or altogether abandoned. As a rule calculated to promote practical administration, we think it should be enforced, and especially so in the present instance, where the question is not a mere question of practice in an isolated case, but a question involving the integrity of systems. While the right of trial by jury should be scrupulously preserved within its constitutional sphere, the province of the chancellor should not be invaded.

Certainly, the chancellor in the present case cannot be charged with abuse of discretion for adopting a mode of assessment in accordance with the established course in equity and permissible by the weight of authority.

IV. Finally, it is said that if equity had jurisdiction to assess the damages, still the court erred in not recommitting the report to the referee for this purpose, instead of ordering the assessment to a master. This was a matter entirely in the discretion of the trial court,—as much so as if it had itself found the primary facts, or caused them to be found by a jury upon issues framed. Its discretion in such case to refer the incidental matter of assessment to a master cannot admit of doubt. That the facts establishing the defendants' liability to an assessment were found by a referee, instead of by the court or a jury, does not alter the discretion of the court in this behalf. The fact that the bill contained no prayer for damage, and that the referee gave no consideration to that subject, left the trial court peculiarly free to exercise its discretion in the present case.

The suggestion, doubtfully made, that by submitting to the reference the parties are estopped to object to a recommittal of the question of damages, is not pertinent, for the question before us is not whether the superior court might have recommitted the case to the referee to assess damages, but whether, having in its discretion ordered an assessment by master, this court can revise that discretion. No question of waiver or estoppel is involved.

While denying that there is any constitutional right to a jury

trial in equity, and maintaining in full vigor the discretion of the chancellor in this regard, we are not to be understood as questioning the propriety of issues to the jury in equity whenever such course commends itself to the good sense of the presiding justice, nor as discouraging such issues in cases where their propriety has already been recognized. On the contrary, expressions of the supreme court, under the old system, as to the proper course in particular cases, may well be accepted by the justices of the superior court for guidance in the exercise of their discretion. Nor are we to be understood as abdicating in any degree the authority conferred upon the supreme court by section 2, chapter 205, Public Statutes, to revise the orders of the superior court sitting in equity, but only as exercising that authority in accordance with recognized principles in equity, and as the practical administration of justice seems to require. Nor, in refusing to interfere with the general order of the superior court for a master to assess damages in the present case, do we understand that the assessment is necessarily to be by some other person than the referee who has heard the case in its general features. On the contrary, if otherwise unobjectionable, there would seem to be strong reasons why the assessment of damages should be sent to him. But this is a matter within the sound discretion of the superior court.

V. A question respecting costs is also raised by the defendants' exception. " Costs shall follow the event of every action or petition, unless otherwise directed by law or by the court." P. S., *c.* 229, *s.* 1. This applies to a suit in equity the same as to an action at law. *Clement* v. *Wheeler,* 25 N. H. 361. The event of an action is that which happens to it in the end—the judgment that is rendered upon the issues of fact or law that finally disposes of the action. Terms are sometimes imposed upon one party or the other during the pendency of the action, but costs are not imposed until its termination. The order of the court in this suit relates to costs, and not to terms pertaining to some interlocutory order. It was premature. The question of costs should be delayed until the end. Equity may then require a different apportionment of the costs than it would now. Upon this point the court are unanimous.

VI. It will be in season to determine whether persons not already plaintiffs in this suit, who claim to have suffered damage as result of the high water of 1897 (if there are any such), should be made plaintiffs by amendment when they apply for leave. In this respect the court are also agreed.

The court being equally divided upon the exceptions to the refusal to dismiss the bill and to the order in so far as it relates

to the assessment of damages, the action of the superior court in those respects, according to the well recognized rule of appellate practice, stands affirmed. *Northern R. R.* v. *Railroad*, 50 N. H. 166, 176, 177; *State* v. *Perkins*, 53 N. H. 435, 437, and cases cited; 3 Cyc. 405, and cases cited. The exception to the order so far as it relates to costs and parties is sustained by unanimous concurrence.

CHASE, J. (PARSONS, C. J., *concurring.*) After the former decision in this case (70 N. H. 458), the defendants moved in the superior court for the dismissal of the bill and for costs. The plaintiffs moved that the damages be assessed by an auditor, commissioner, or master, or by the court; that all parties claiming damages have leave to appear as parties plaintiff; that costs to that time be awarded the plaintiffs; and that subsequent costs abide the result of the action. The court denied the defendants' motion and granted the plaintiffs', subject to exception.

While the court are agreed that the granting of the plaintiffs' motion as to costs and admitting additional parties cannot be sustained, the justices sitting in the cause are equally divided upon the question presented by the defendants' exception to the orders denying their motion to dismiss the bill and granting the plaintiffs' motion for the assessment of damages.

Under the practice in this state during the last twenty years, it is not usual to take time to consider whether the relief applicable to the facts can or cannot be awarded in the particular proceeding. If upon a trial at law it is shown that the plaintiff is entitled to equitable relief instead of the relief sought, the form of action is changed by amendment and appropriate relief is decreed. *Wilcox* v. *Busiel*, 70 N. H. 626; *Tripp* v. *Company*, 69 N. H. 233; *Brooks* v. *Howison*, 63 N. H. 382, 389; *Metcalf* v. *Gilmore*, 59 N. H. 417, 431. Similarly, if misconceiving his remedy the plaintiff seeks it in equity instead of at law, an amendment changing the form of the proceeding removes the difficulty. *Walker* v. *Walker*, 63 N. H. 321, 326; *Cushing* v. *Miller*, 62 N. H. 517, 527. It has been repeatedly said that time spent in considering whether the form of action is appropriate is wasted. *Fowler* v. *Owen*, 68 N. H. 270, 271; *Gage* v. *Gage*, 66 N. H. 282, 296; *Peaslee* v. *Dudley*, 63 N. H. 220. When the objection can be obviated by amendment, it is ordered without considering its necessity. *Peaslee* v. *Dudley, supra; Sleeper* v. *Kelley*, 65 N. H. 206; *Morse* v. *Glover*, 68 N. H. 119, 120. The avoidance of the objection is regarded as a sufficient reason for making the order. *Roulo* v. *Valcour*, 58 N. H. 347; *Metcalf* v. *Gilmore, supra.* "When on a full and fair trial the merits of a controversy have been

determined, and the only objection is to the form of procedure, the prevailing party is permitted to file any amendment of his pleadings that may be necessary to obviate the objection, and thereupon to take judgment." *Carpenter*, C. J., in *Johnson* v. *Association*, 68 N. H. 437, 439; *Holman* v. *Manning*, 65 N. H. 228, 229; *Peaslee* v. *Dudley, Cushing* v. *Miller*, and other cases above cited. These cases are only a few of the cases in which the rule has been approved and applied. The practice has been followed in many other cases which did not reach the law term. It has received the approval of the bar, and been specially authorized by the legislature. Laws 1879, *c.* 7, *s.* 1; P. S., *c.* 222, *s.* 8.

In this case the facts in controversy have been fully and fairly tried, and the law respecting the rights of the parties has been settled. It has been decided that the plaintiffs are not entitled to equitable relief, but are entitled to compensatory damages. Whether the damages can properly be awarded in equity is of no importance, because if not, the defect can be obviated by filing counts in trespass. Such amendment would render the defendants' contention, that the bill should be dismissed for want of jurisdiction in equity to proceed farther, immaterial; because, assuming their contention to be sound, the action would proceed at law.

The plaintiffs have not asked for such an amendment, and as a majority of the court do not agree that it should be ordered, the questions raised respecting the assessment of damages cannot be disposed of in that way. Although the law cannot be settled, because of the equal division of the court, we feel called upon to state the reasons for our position. They are founded in part upon an understanding of the pleadings and facts of the case and the decision already rendered, which differs materially from that of our associates as disclosed in the opinion prepared by Judge *Remick*, and in part upon a different understanding of the law applicable to the facts.

The plaintiffs are the state, a corporation which navigated the lake with steamboats, and six owners of land upon the shores of the lake. They allege in the bill, filed March 17, 1898, that the lake is a "large natural pond" in which the public have the rights of fishing, boating, bathing, etc., and in which the plaintiffs as owners of land upon its shores have the rights of littoral proprietors; that "for several, to wit, five years past" both the public and private rights have been infringed by the defendants, by wrongfully, unlawfully, and unreasonably raising the water above and lowering it below its natural level by means of the dam maintained by them at the outlet of the lake; that the defendants claim the right to raise and lower the lake to suit their convenience; that they intend and have threatened to exer-

cise the right, regardless of the rights of the public and the plaintiffs; and that such course will cause irreparable injury to the plaintiffs. The prayer is for an injunction to restrain the defendants from changing the natural level of the lake by means of the dam, and for such other relief as may be just. Apparently, the only equitable relief that was in the contemplation of the plaintiffs was that specifically invoked—the restraint of a nuisance whose continuance would cause them irreparable injury.

The answer sets forth the defendants' charter and alleges that they have the rights conferred by it, and that they built the dam and lowered the channel at the outlet of the lake, and have maintained the same in the exercise of those rights. It denies that they have infringed public and private rights by raising and lowering the water, and that they intend or have threatened to exercise their rights regardless of the rights of the public and the plaintiffs.

The case was referred to a referee, without objection by either party so far as appears. He reported facts of which the following are material to the present inquiry: A charter was granted to the defendants December 7, 1820, by which they were empowered "to sink the outlet of said lake at the source of said Sugar river to the depth of ten feet below the low-water mark of said lake, and to erect and maintain a dam there with suitable gates and flumes to the height of said low-water mark, for the benefit of the mills and mill privileges" on Sugar river, provided the defendants should make or tender reasonable compensation to those who should suffer damage by the erection of the dam. The defendants organized under the charter in 1821, and soon built a dam at the outlet of the lake of a height that has never been changed. Since 1851, the dam has consisted of upright timbers located at some distance from each other, having grooves on the sides into which plank are dropped. The plank are removable at pleasure. In that year, the defendants sunk the channel near the dam two and one half feet or more, but never to the limit specified in the charter. In 1880 or 1881,—an extremely dry year,—and perhaps in other years, they lowered the water to such an extent as to affect the enjoyment of the estates of littoral proprietors on the lake, and to render navigation inconvenient and dangerous. In 1845, 1851, 1859, and perhaps other years, they put additional plank or flashboards on the dam and flowed the lands of littoral proprietors, some of whom brought suits. The defendants settled the suits, not merely to purchase peace, but acknowledging their liability. In the settlement with Pike (a predecessor in title of one of the plaintiffs), made in 1855, they agreed not to raise the water to a higher level than the point indicated by the figures "10" upon

the gauge at the dam, and since then they have not claimed the right to raise it above that level. So far as stated in the report, there were no complaints of flowage between 1859 and 1897. Prior to the latter date changes were made in the by-laws of the corporation relating to the control of the dam, and a person to manage it was substituted for one previously employed. During the spring and summer of 1897, especially in May and June, an exceptionally large quantity of rain fell, and the water of the lake was extremely high, and its level was further raised by putting plank upon the dam. It did not appear who put the plank there, but the defendants' agent knew of it "and permitted them to remain until June 12, thus continuing the level of the water at an unusual height for an unreasonable length of time." His management of the dam was not reasonable and proper. On that day, the defendants, upon complaint of parties whose rights were affected by the flowage, ordered their agent to lower the water. The plaintiffs, or some of them, suffered damage at this time.

In the former opinion, the court, after deciding that the defendants' charter is valid, say " that the mere lowering of the lake by the defendants to the charter point can afford the state and the public no well founded ground of complaint, if done in a reasonable manner; and *a fortiori*, much less can the lowering of it only about two and one half feet, which is the extent of the defendants' acts in that regard, so far as appears. And certainly the littoral proprietors, as such, can have no better ground of complaint, because as is well understood, in public waters there is no private ownership in the soil below ordinary high-water mark. The primary ground of their grievance, and the one from which all the others follow, is the uncovering of a portion of the land underlying the water between the high and low-water mark. · . . . If this affords some inconvenience to the plaintiffs in reaching the water, or lessens the enjoyment of residences upon or near the lake shores, there is no legal ground of complaint; it is purely *damnum absque injuria.*" *State* v. *Sunapee Dam Co.*, 70 N. H. 458, 460, 461. After referring to the requirement that the defendants shall exercise their right to lower the lake in a reasonable manner, in view of the rights of others having interests in the waters and shores of the lake, and reviewing the defendants' acts in this respect, the court say: "We are of opinion that no case is established by the reported facts which entitles the plaintiffs, or any of them, to equitable relief." In other words, the plaintiffs failed to sustain the allegations of their bill in respect to the lowering of the water. So far, at least, as this matter is concerned, the defendants' are entitled to an order dismissing the bill. In fact, the plaintiffs are not entitled to any remedy, legal or equitable, on this account.

It is further said in the former opinion that the charter limits the height of the dam to low-water mark, and that the defendants originally built it to high-water mark, or two feet higher than the charter authorized. But by the Pike agreement, made in 1855, the defendants limited the height to which they might raise the water to the point indicated by the figures "10" upon the gauge at the dam, which is understood to be in the line of the natural high-water mark of the lake. Since that date they have not claimed the right to raise it higher; and the dam is so constructed that it can be readily adjusted to the capacity required for raising the water to this height. It is not a permanent structure of a given height, but a structure whose height is variable according to the number of plank in use for the time being. The court say, that upon the reasonable construction of the Pike agreement, "no violation of it by the defendants appears until 1897." After rehearsing the findings of the referee in relation to the flowage of May and June, 1897, the court state their conclusion as follows: "While the foregoing findings leave no room for doubt that the right to an assessment of compensatory damages in favor of those of the plaintiffs who may be legally entitled thereto is established in the particular instance referred to,—yet, in view of the circumstances attending it, as detailed by the referee, the improbability of its repetition, and the unquestioned ability of the defendants to respond in damages, we do not think a case is made which at this time calls for the restraining power of equity by way of injunction." It could not be justly held that the dam, constructed as it was and used as it had been for more than forty years, without a claim of right to use it otherwise, was a nuisance. *Town* v. *Faulkner*, 56 N. H. 255. The plaintiffs having failed to prove the existence of a nuisance that flowed their lands or infringed their rights to their irreparable injury, the injunction they prayed for was denied.

This disposed of the entire case made by the bill and answer, and the facts found thereunder. Ordinarily, under such circumstances the bill would be dismissed. But in this case the referee found facts which entitled the plaintiffs, or some of them, to "an assessment of compensatory damages," arising from the defendants' negligence in the management of the dam in May and June, 1897. Although this was a matter for the determination of a court of law, instead of a court of equity, the referee could assess the damages with less delay and expense to the parties and less expense to the public than any other tribunal. If he was not selected by the parties and appointed in accordance with their agreement, none of them objected to him or his appointment, so far as appears. If they could have objected, they waived their right to do so by

going on with the hearing before him without objection. His report shows that he understood the question of damages was included in the reference. He says: "The question of damages, if any, to which the plaintiffs, or either of them, are entitled, has not been determined by the referee; that question having been deferred until the measure of the plaintiffs' rights and the defendants' duties and obligations to them, upon the foregoing facts, is determined by the court." The plaintiffs also so understood it. They say in their brief, "that the plaintiffs at the trial raised the question of damages, and the grounds upon which the referee refused to consider it are clearly stated in the report," referring to the portion of the report above quoted. They have no just ground to complain of a denial of their motion to have the damages assessed by an auditor, commissioner, or master, provided the matter is recommitted to the referee. There is evidence tending strongly to show that the defendants have so far committed themselves to the reference that they have waived their right to a trial by jury, if they would otherwise be entitled to the right. Presumably, it was in view of these facts that the court discharged the case before it, instead of dismissing the bill.

But suppose the conduct of the parties was not such as to require the recommittal of the question of damages to the referee; or suppose the presiding justice could properly deny a recommittal: the question arises whether he, as a court of equity in the exercise of his discretion, had authority to try the question himself, or to commit it to a master or a jury for trial, in view of the fact that equitable relief was denied. This question is of grave importance, inasmuch as an erroneous decision may deprive the parties of the right of trial by jury guaranteed to them by the constitution. Whether before our constitution went into effect there were, in equity, any "controversies concerning property" which were usually tried by jury, and which fall within the guaranty of the bill of rights, is a question that need not now be considered. Undoubtedly, the chancellor had authority to try most questions arising in equity suits, himself or by a master or a jury, according to his discretion; and parties now have no constitutional right to a trial of them by a jury. But in this state, at least, the chancellor's discretion is liberally exercised in favor of submitting such questions to a jury. *Tasker* v. *Lord*, 64 N. H. 279; *State* v. *Currier*, 66 N. H. 622; *S. C.*, 19 Atl. Rep. 1000, where the case is more fully reported than in the state report; *State* v. *Saunders*, 66 N. H. 39. As was said in the latter case, "in our present practice there is a jury trial in many cases in which it is not a constitutional right." If the court had jurisdiction to assess the damages in this case according to his discretion, it would be in accord-

ance with our practice to do it by a jury; and there is authority for sustaining the defendants' exception on this ground. *Clough* v. *Fellows,* 63 N. H. 133; *Pearson* v. *Railroad,* 63 N. H. 534.

But we are unable to agree that the court, sitting as a court of equity, has jurisdiction to assess these damages, or that they can be properly assessed in this suit except by a recommittal of the question to the referee, as above suggested. As a general rule, a court of equity does not have jurisdiction to assess damages for the breach of a contract or for a tort, in the absence of some equitable ground for such relief. *Baily* v. *Taylor,* 1 R. & M. 73; 1 Pom. Eq. Jur., s. 112; 2 Sto. Eq. Jur., s. 799. If the court has jurisdiction of the subject-matter and decrees equitable relief, it may consider and adjust the plaintiff's damages for past injuries as an incident to the relief afforded. *Coe* v. *Company,* 37 N. H. 254, 266; *Bassett* v. *Company,* 43 N. H. 249; *Dennett* v. *Dennett,* 43 N. H. 499, 503; *Eastman* v. *Bank,* 58 N. H. 421; *Milan Steam Mills* v. *Hickey,* 59 N. H. 241; *Gale* v. *Sulloway,* 62 N. H. 57, 60. In the *Bassett* case, *Bell,* C. J., after stating the general principles on the subject, says: "It results from these principles, that any defence which goes to the whole ground of the relief by injunction is fatal to the bill, and such defence being sustained, the court will not retain the bill for any purpose of settling the damages." See, also, *Baily* v. *Taylor, supra,* a case directly in point; *Parrott* v. *Palmer,* 3 Myl. & K. 632; *McCone* v. *Courser,* 64 N. H. 506.

Courts of equity also assess and award compensation in some cases in which such action is not incidental to the relief afforded. In bills for the specific performance of contracts, if it appears that the defendant has disabled himself from performing the contract during the pendency of the suit, the court, although it cannot decree specific performance, will afford alternative relief by compelling the defendant to make compensation for his breach of the contract, and will retain the bill for the purpose of having the amount of such compensation ascertained. *Denton* v. *Stewart,* 1 Cox. Ch. 258; *Greenaway* v. *Adams,* 12 Ves. Jr. 395; *Gwillim* v. *Stone,* 14 Ves. Jr. 128; *Todd* v. *Gee,* 17 Ves. Jr. 273; *Blore* v. *Sutton,* 3 Mer. 237, 248; *Morss* v. *Elmendorf,* 11 Paige 277, 288; *Woodcock* v. *Bennet,* 1 Cow. 711, 755; *County* v. *Kimball,* 102 U. S. 691. The same course is pursued when the defendant's disability occurs before the suit is brought, provided the plaintiff had no knowledge of the fact when he began the suit, but supposed in good faith that he was entitled to specific performance. *Hatch* v. *Cobb,* 4 Johns. Ch. 559; *Kempshall* v. *Stone,* 5 Johns. Ch. 193; *Morss* v. *Elmendorf, supra; Milkman* v. *Ordway,* 106 Mass. 232; *Chartier* v. *Marshall,* 51 N. H. 400; *S. C.,* 56 N. H.

478.   It has furthermore been held that where a vendor has contracted to convey a tract of land, and the title to a part of it fails, the vendee may have specific performance of the contract as to the residue of the land, and compensation and damages for failure to convey the part of which the defendant has no title.   *Morss* v. *Elmendorf, supra; Cleaton* v *Gower*, Finch 164; *Pratt* v. *Law*, 9 Cranch 456.   In all these cases the plaintiff would have a decree for specific performance were it not for the fact that performance is rendered impossible by the acts of the defendant or some other fact.   As performance is impossible, damages are awarded in place of it, as alternative relief.

The doctrine of these cases was doubted at first.   In *Greenaway* v. *Adams, supra*, the court appears to have reluctantly followed the decision in *Denton* v. *Stewart, supra*.   The master of the rolls, Sir William *Grant*, says: "If the court does not think fit to decree a specific performance, or finds that the contract cannot be specifically performed, either way I should have thought there was equally an end of its jurisdiction; for in the one case the court does not see reason to exercise the jurisdiction; in the other, the court finds no room for the exercise of it.   It seems that the consequence ought to be, that the party must seek his remedy at law." *Denton* v. *Stewart* is also questioned, but followed, in *Gwillim* v. *Stone, supra*, and in *Todd* v. *Gee, supra*.   In the latter case, Lord Chancellor *Eldon* says: "My opinion upon the question, which depends on the three cases cited [the three last mentioned], is confirmed by reflection; that, except in very special cases, it is not the course of proceeding in equity to file a bill for specific performance of an agreement, praying in the alternative, if it cannot be performed, an issue or an inquiry before the master, with a view to damages.   The plaintiff must take that remedy, if he chooses it at law; generally, I do not say universally, he cannot have it in equity.   .   .   .   In *Denton* v. *Stewart*, the defendant had it in his power to perform the agreement; and put it out of his power pending the suit.   The case, if it is not supported upon that distinction, is not according to the principles of the court." The doctrine, however, has become more or less firmly established in the practice of courts of equity—firmly and generally so far as it relates to cases where the defendant voluntarily disables himself from performing the contract during the pendency of the suit.

The cases cited in Judge *Remick's* opinion were decided either upon an application of the above mentioned principle, or upon a consideration of some supposed special equity involved in the case. Of the latter class is *Phillips* v. *Thompson*, 1 Johns. Ch. 131, in which an issue of *quantum damnificatus* was awarded, "as the plaintiff had sustained an injury for which he ought to be com-

pensated, and for which he had no remedy, or, at best, a doubtful and inadequate one, at law." Similar reasons were given for the decisions in *Parkhurst* v. *Van Cortlandt*, 1 Johns. Ch. 273, *Aday* v. *Echols*, 18 Ala. 353, 357, and *Jackson* v. *Stevenson*, 156 Mass. 496. In *London* v. *Nash*, 3 Atk. 512, the plaintiff, by laches, had suffered the defendant to place himself in a position in which he would be subjected to great loss and hardship if specific performance were enforced. See, also, *Brande* v. *Grace*, 154 Mass. 210. If the form of the bill is such that a demurrer to it would be sustained on the ground that the plaintiff has an adequate remedy at law, and the defendant yields to the jurisdiction without objection, he will be bound to submit to the jurisdiction throughout, and to have damages awarded against him as if incident to other equitable relief. *Creely* v. *Company*, 103 Mass. 514; *Woodbury* v. *Company*, 145 Mass. 509. "Where the bill alleges proper matter for the jurisdiction of a court of equity (so that a demurrer will not lie), if it appears on the hearing that the allegations are false, and that such matter does not in fact exist, the result must be the same as if it had not been alleged, and the bill should be dismissed for want of jurisdiction." *Jones* v. *Bradshaw*, 16 Grat. 355. *Stearns* v. *Beckham*, 31 Grat. 379, is not inconsistent with this case or the views expressed in this opinion. See, particularly, page 420 of the report. The New York authorities cited by Judge *Remick* have no weight here. "As the courts of the [that] state are now constituted, they apply legal and equitable rules and maxims indiscriminately in every case." *New York etc. Ins. Co.* v. *Company*, 14 N. Y. 85, 90; *Despard* v. *Walbridge*, 15 N. Y. 374; *Phillips* v. *Gorham*, 17 N. Y. 270; *New York Ice Co.* v. *Company*, 23 N. Y. 357.

Story's statement of the result of the authorities upon this point requires no modification when the cases cited by Judge *Remick* are taken into consideration. In fact, the statement is strengthened thereby. Story says: "In the present state of the authorities, involving, as they certainly do, some conflict of opinion, it is not possible to affirm more than that the jurisdiction for compensation or damages does not ordinarily attach in equity, except as ancillary to a specific performance or to some other relief. If it does attach in any other cases, it must be under very special circumstances and upon peculiar equities, as, for instance, in cases of fraud, or in cases where the party has disabled himself by matters *ex post facto* from a specific performance, or in cases where there is no adequate remedy at law." 2 Sto. Eq. Jur., s. 799. "Compensation or damages (it should seem) ought, therefore, ordinarily to be decreed in equity only as incidental to other relief sought by the bill and granted by the court; or where there

is no adequate remedy at law; or where some particular equity intervenes." *Ib.*, s. 794; Gould Wat., ss. 223, 561; *Coe* v. *Company*, 37 N. H. 254, 266.

*Carpenter* v. *Fisher*, 68 N. H. 486, is also cited in Judge *Remick's* opinion to sustain the views there expressed. It was held in that case that the question of the amount of damages caused to a prevailing defendant by a preliminary injunction issued against him in the suit was incidental to the principal issues, and might be determined in the suit upon equitable principles. Such damages are an incident of the suit,—arise from its prosecution,—and the court has authority to measure them and leave the parties as it found them, although they grant no relief. It does not fall within the general rule, but is an exceptional case, the "special circumstances" and "peculiar equities" of which justify a departure from general principles.

There is a New Hampshire case that singularly resembles the present case—*Coe* v. *Company*, 37 N. H. 254. The plaintiff owned lands upon the shores and islands of Squam lake. The defendants built a dam across the outlet of the lake and lowered its channel. By these means they raised and lowered the water of the lake, causing the plaintiff, as he alleged, irreparable injury, and threatened to continue the wrongful acts. The prayer of the bill was for an injunction to restrain the defendants from drawing off the water to a greater extent than it naturally flowed, and from throwing back the water by means of the dam. The defendants' demurrer to the bill was sustained, and the bill was dismissed with costs. The court say: "Upon looking to the facts alleged, they present nothing of a peculiar or extraordinary character, either in a subject-matter or nature of the injury threatened. The destruction of the plaintiff's grass and timber, the deterioration of his land, the throwing it open to cattle thus rendering additional fences necessary, and the obstruction to the passage of logs [by the dam], assuming that all these are the necessary consequences of the proceedings of the defendants, are the usual consequences of direct trespass to land, or of torts, for which consequential damages may be recovered, and for which adequate compensation may be given at law." In speaking of damages occasioned by nuisances of this kind, they say (*p.* 266): "For this, the remedy at law is in all respects as full and complete, and as efficacious and prompt, as in equity. Indeed, as to past damages thus sustained, equity affords no remedy when they are disconnected from all other grounds for its interposition."

Assuming that the only ground of equity jurisdiction in the present case is the abatement of a nuisance that threatens irreparable injury to the plaintiffs, the examination of the authorities

and reflection upon the question that we have been able to make, lead us to the conclusion that the superior court, sitting as a court of equity, had no authority to assess the plaintiffs' damages for the torts committed in May and June, 1897, it having been determined that the plaintiffs were not entitled to an injunction. It must, we think, be admitted by everybody that a court of law furnishes an adequate and complete remedy for such torts. The plaintiffs attempted to show that the defendants' acts and threats constituted a nuisance and would cause irreparable injury, and so afforded ground for equitable jurisdiction and relief; they failed in the attempt, and the ground for equitable relief has gone out from under them. They have shown that they are entitled to relief in a court of law; a court of equity cannot afford them this relief, any more than a court of law could afford them equitable relief if it turned out upon the trial of the case in such court that they were entitled to that relief instead of the relief they sought in the action at law. The distinction in the jurisdictions of the two courts continues so far as these matters are concerned, and is very important. A loose practice in the observance of it will seriously endanger the constitutional right which parties have to a trial by jury when their property rights are in controversy. The cases in this state show that the court have been very particular not to encroach upon this right. When there is a doubt whether a party is entitled to the right or not, the provision of the constitution is given the benefit of the doubt.

There is nothing that brings the case within an exception to the general rule. The specific relief sought has not been rendered impossible by any acts of the defendants, either before or since the commencement of the suit, except so far as the inherent nature of the defendants' acts themselves rendered such relief impossible under the rules of law. The acts of May and June, 1897, were not the result of fraud, but of negligence; they were ordinary torts. We discover no special circumstances or peculiar equities calling for an assessment of the damages. The plaintiffs are not entitled to an assessment as ancillary to other equitable relief, for no such relief is afforded; nor are they entitled to it as taking the place of, or "alternative to," other equitable relief, for it does not take the place of such relief, but if granted will simply afford the relief of an action at law.

The opinion also places the jurisdiction upon another and independent ground of equitable jurisdiction—that of determining the extent of the respective rights of parties in water and water privileges, and the proper mode of exercising and enjoying them. It is a sufficient answer to this position that the bill sets forth no such case and asks for no such relief. It is true that the defend-

ants' charter has been construed, but that was merely an incident of the proceeding. If the action at law brought by Quackenbos against the defendants were tried, it would no doubt be necessary to construe the defendants' charter upon the trial. The construction of the charter is a pure question of law, and in no sense an equitable question. When the case was formerly before the court, no attempt was made to specifically prescribe how the respective parties should exercise and enjoy their rights. No one has asked for a decree of that kind. It would be very difficult, if not impossible, to set forth in a decree the particular manner in which the dam shall be managed under all the varying conditions affecting the control of the level of the water, so as to afford the defendants a reasonable exercise of their rights and not trespass upon the rights of the plaintiffs. . The boundary between the rights of the parties is that which is reasonable in view of all the circumstances. The circumstances are so variable and uncertain that it would seem to be impracticable to define or set up a more definite boundary in advance. The case differs from cases in which the rights of mill-owners upon a dam may be measured out to them by limiting the size of the orifices in the dam through which they take water, or limiting the number of cubic feet per second that they may draw. It differs from *Conn. River Lumber Co.* v. *Company*, 65 N. H. 290, in which it was suggested that the form, dimensions, and place of a sluice, in which the public should exercise their right of running logs over a dam across a river that was a public way, might be prescribed by a decree in equity. This seems a much less difficult problem than it would be to set forth the steps that shall be taken under all the varying conditions of water to insure to all the parties in interest their several rights. In *Burnham* v. *Kempton*, 44 N. H. 78, 100, it is said: "A court of equity will not assume jurisdiction of a case under any pretence of adjusting rights in common to water-power, when it is perfectly apparent that all that is sought or needed by the parties, or either of them, is the settling and establishing of a disputed right, which depends entirely upon the application of legal principles, and where, from the character of the right in question, and the evidence upon which it must be established, it is evidently a case peculiarly appropriate for the consideration of a jury and for a decision in a court of law." It appears from the decision already rendered in this suit that all the parties needed was a decision as to the validity and interpretation of the defendants' charter.

Nor is the equitable jurisdiction invoked in the case that of preventing a multiplicity of suits. It is true that several parties having a community of interests join in the suit; but they do not seek relief on that ground. They say that each of them suffers irreparable injury

from the maintenance of a nuisance, and they pray for an injunction to abate the nuisance. They do not seek to recover the damages they have severally suffered by the defendants' wrongful acts, on the ground that equity has jurisdiction to assess and award the damages to prevent a multiplicity of suits at law. If equity has jurisdiction on this score, it does not need other grounds to support the jurisdiction. If this were sufficient ground, a bill could be maintained by the plaintiffs if their sole object was to obtain compensation for the injuries done to them by the high water of May and June, 1897. If the principle applies to this case, we do not see why it would not apply to any case in which a number of independent persons are injured by the same wrongful act or negligence, as, for example, a case where a number of persons are injured in a railroad accident, or by a fire set by sparks from a locomotive. See *Tribette* v. *Railroad,* 70 Miss. 182. Such a doctrine would take away the right of trial by jury in numerous cases in which it has heretofore been regarded as an absolute right. We are not prepared to give assent to the doctrine. It should be borne in mind that if the damages are assessed on this ground, it must be on this ground only; that the jurisdiction will not be exercised incidentally to that of other equitable jurisdiction, for no other equitable relief will be afforded.

*Smith* v. *Bank,* 69 N. H. 254, is cited as an authority sustaining the position taken on this point in Judge *Remick's* opinion. The defendants in that case were trustees of property held for the benefit of the plaintiffs. The prayer of the bill was for a discovery and accounting, and for a determination of the damages caused by the defendants' negligence in the management of the trust estate, and a decree that the defendants should pay the same. The damage was a single sum depending upon the nature and extent of the negligence and its injurious effects upon the rights of the beneficiaries. When determined and recovered, it would be a trust fund in which the plaintiffs would be entitled to share according to the amount of bonds severally held by them—a matter that could be readily determined by computation. If the plaintiffs had brought several actions at law, not only the question of the defendants' negligence would necessarily be determined upon the same evidence, but the damages would be assessed upon the same principle, and necessarily ought to be the same sum. It would be useless litigation and a multiplicity of needless suits to have these questions tried seventy-nine times (there being seventy-nine plaintiffs), when a single trial would settle them. It should be noticed, also, that no question was raised as to the rights of the parties to a jury trial; they have had two jury trials covering numerous issues of fact that arose in the case, both having all the character-

istics of, and being treated in all respects as if they were, the common-law jury trials guaranteed by the constitution.   Smith v. Bank, 70 N. H. 187 ; S. C., ante, p. 4.   In the present case, the assessments of damages must of necessity be several.   The nature and extent of the injury suffered by the plaintiff Quackenbos depend upon the location, nature, and extent of his particular land and its appurtenances, while those of the plaintiff Hay depend upon the extent and peculiarities of his property.   It would be very inconvenient, if not impracticable, to assess the damages for each plaintiff's injury on a single trial.

As the court are equally divided upon these questions and as to the propriety of ordering an amendment, the question arises what action can be taken in the case.   This question was exhaustively considered in Northern R. R. v. Railroad, 50 N. H. 166, and the conclusion was reached that in that case nothing could be done except to continue the case for further advisement.   In a later case, State v. Perkins, 53 N. H. 435, it is said that, as a result of the former case, a rule was adopted by which in civil cases and cases for misdemeanors verdicts depending upon questions of law reserved should generally be sustained when the court were equally divided, in the absence of a good reason for a different course. Diligent search has failed to discover a record of this rule.   Inasmuch as, if now in force, the rule leaves open the question whether it should be applied in a particular case, it cannot be effective to dispose of a case unless a majority of the court shall agree that the case is one in which it should be applied.   In this case, there is no question of sustaining a verdict or ordering judgment.   Upon exception to certain interlocutory orders, the superior court reserved the question of law for the determination of this court. The court is unable to determine the question.   The result is that this portion of the order cannot be set aside nor be affirmed ; it stands,—without any decision as to its legality,—for such further action as the superior court shall see fit to take.

*Case discharged.*

WALKER, J., did not sit, having been of counsel.